SECURITIES & EXCHANGE COMMIS-
SION, Plaintiff,

v.

MONO–KEARSARGE CONSOLIDATED MINING COMPANY, a Utah corporation; Jean R. Veditz Co., Inc., a New York corporation; R. B. Gravis, Inc., a New York corporation; James B. Boren; Charles E. Collins; Charles Pennington and N. R. Real, Defendants.

No. C–58–58.

United States District Court
D. Utah,
Central Division.
Oct. 7, 1958.

John F. Lee, Salt Lake City, Utah, Milton J. Blake, Joseph F. Krys, Denver, Colo., Charles T. Kappler, Washington, D. C., for Securities & Exchange Commission.

Alexander H. Walker, Jr., Salt Lake City, Utah, for defendant Mono-Kearsarge Consol. Mining Co.

Jordon R. Metzger, New York City, and Samuel Bernstein, Salt Lake City, Utah, for defendant Jean R. Veditz Co., Inc.

Leon M. Frazier, Provo, Utah, and Thomas A. Bolan, New York City, for defendant R. B. Gravis, Inc.

CHRISTENSON, District Judge.

This is an action brought by the Securities & Exchange Commission, hereinafter referred to as "SEC", to enjoin the defendants from making use of any means or instruments of communication or transportation in interstate commerce or of the mails for selling or delivering the stock of Mono-Kearsarge Consolidated Mining Company, or other securities, in violation of Section 5, of the Securities Act of 1933, 15 U.S.C.A. § 77e.

The defendants Charles Pennington and N. R. Real were not served. Injunctions already have been entered against Charles E. Collins and James B. Boren by consent. The remaining defendants Mono-Kearsarge Consolidated Mining Company, a Utah corporation, Jean R. Veditz Co., Inc., a New York corporation and R. B. Gravis, Inc., a New York corporation, have contested the plaintiff's claims. The corporate defendants last mentioned will be referred to respectively as "Mono-Kearsarge", "Veditz Co.", and "Gravis, Inc."

Basic and largely undisputed facts are these:

In the fall of 1957, the defendant Mono-Kearsarge was in financial difficulty. Boren approached its president, Alonzo Mackay, and proposed a plan which in the latter's view promised to breathe life into the company. Boren was to transfer to Mono-Kearsarge certain oil and gas interests, and to enlist the support of other individuals and dealers in promoting the company. In return he and his nominees were to receive 51% of the corporation's outstanding stock. To effectuate this plan, and as a part thereof, the company by mail and personal contact solicited its shareholders to donate to it 51% of the stock held by them. In response to this request, a total of 962,000 shares was received by the company. This amount did not comprise 51% of the outstanding stock, so from its authorized but unissued capital the company issued an additional 250,000 shares to make up at least a majority control. On December 10, 1957 this total of 1,212,000 shares was transferred to Boren and his nominees in return for the oil and gas interests.

During the first part of 1958, Boren and his associates commenced distributing the 962,000-share block to the public. The distribution was accomplished primarily by delivering the stock through a New York attorney, Sidney B. Josephson, to the defendant Pennington who resided in Canada. The latter, and persons connected with him, transferred a substantial portion to the defendants Veditz Co. and Gravis, Inc., who are securities dealers in New York City registered with the Securities & Exchange Commission. The defendant Real and one Benjamin Goldstein helped to interest the dealers in the stock. Real and Goldstein were among the persons nominated by Boren to take stock out of the 962,000-share block. Goldstein worked for Veditz Co. and was acquainted in a business way with Gravis, Inc. Jean R.

Veditz, the managing officer and beneficial owner of Veditz Co., and R. B. Gravis, who occupied a similar position with his company, were not acquainted personally prior to the institution of this action. Veditz Co. and Gravis, Inc. procured through Pennington and his associates in Canada totals of 436,000 and 657,000 shares, respectively, including the greater part of the 962,000-share block, and sold substantially all of these to numerous investors in various parts of the United States by using the mails to deliver advertising brochures and stock certificates, and by long distance telephone calls to promote and arrange sales.

The stock was not registered with the Securities & Exchange Commission in accordance with the Act, 15 U.S.C.A. § 77f.

Mono-Kearsarge contends that the transaction whereby the 962,000-share block was delivered to Boren and his nominees was exempt under 15 U.S.C.A. § 77d(1) as a transaction "by an issuer not involving any public offering." Securities and Exchange Commission v. Ralston Purina Co., 346 U.S. 119, 73 S. Ct. 981, 97 L.Ed. 1494.

Let it be granted for the purpose of this discussion that if in good faith the corporation, as issuer, transferred stock to Boren and a limited number of persons designated by him because of consideration furnished by some of them to the corporation and because of the continuing interest of all of them as long-term investors in the success of the corporation, a private offering under the surface indications of this case would be indicated. Such investors with such special knowledge of, and interest in, the corporation and in view of such continuing connection, could well be considered a class able to fend for itself in a transaction not involving any public offering within the doctrine of Securities and Exchange Commission v. Ralston Purina Co., supra.

If known to the company, or under circumstances reasonably placing it on notice, however, Mono-Kearsarge transferred stock to persons, however limited in number or well informed, who did not intend to treat it as investment stock but who claimed the right of immediate redistribution to the public and who actually made such redistribution, I am of the opinion that the company must be held to have acted at its peril. Under the latter circumstances it properly could not claim by virtue of the mere form of the transaction that a private, rather than a public, offering was involved. If this were otherwise, the prohibitions of the Act without warrant would be made pusillanimous and futile to accomplish the purposes intended by Congress. In such event, an issuer with impunity, through a limited group and by a transaction private in form only, for its own benefit and for such consideration as it might exact, could distribute to the public whatever quantities of stock it desired without protection to the public contemplated by law. Neither an issuer nor an underwriter may separate parts of a series of related transactions the totality of which is designed and known to constitute an unlimited offer and rely only upon that part which in form indicates that the offering was private.

It becomes important, therefore, to determine whether Mono-Kearsarge had reason in good faith to believe that Boren and his nominees were taking the stock as investors without the purpose of making an immediate public distribution, as contended by Mono-Kearsarge, or whether it knew that Boren considered the stock "free" and intended to make public distribution, as it turned out that he actually did.

The basic requirement is that registration must occur before any security is offered or sold unless there is involved either an exempt security or an exempt transaction.

The burden of proof is upon the person claiming an exemption to show that it applies. On the point of discussion, not only did Mono-Kearsarge fail to discharge this burden, but on the record before the Court it is clearly es-

tablished that it had reason to know, and did know before it made the transfers in question, that Boren recognized no limitation upon retransfer and that he took it under circumstances which made this consequence the natural, if not the inevitable, one.

In his deposition Boren attempted to support the private investment theory by saying he wanted to help "this little company" merely for the possibility of some long-term realization on his part. He emphasized that his nominees were limited in number, and he contended that he left stock with Attorney Josephson not for the purpose of sale but in "escrow". His explanation on the latter point would have to be rejected, if only upon the basis of the receipt which Josephson gave him which clearly contemplated disposition of the stock by Josephson, but there are other cogent reasons for doing so. The identity of his "nominees" was so vague in his mind that it is fair to infer that the initial limitation of their number was a rather meaningless attempt to afford semblance of privacy to the transaction. He said when asked whether there were people other than he had named who initially received part of the stock: "Well, there was quite a few people involved, but I don't remember all of their names, but just like I suggested to individual stockholders, Mr. Collins suggested to me certain ones and Mr. Real suggested certain ones." In response to his counsel's question at another point he explained his idea of private transactions by saying he would not "step downstairs and hail someone he didn't know * * *" but "it would be a friend or business associate." Boren testified that when he learned in the course of negotiations that some question had been raised about the status of the 962,000-share block he called William J. O'Connor, Jr., director of Mono-Kearsarge and told him that if it were "free" he would go ahead.

On November 4, 1957 Mackay, as president of Mono-Kearsarge, gave notice of a stockholders' meeting (plaintiff's exhibit 1) with reference to the "proposed purchase by the company" of oil interests "the consideration being 51% of the outstanding stock of our company." On several occasions thereafter this proposal of the corporation was elaborated upon and supported and while it was never acted upon by the stockholders in a formal meeting, the evidence leaves no room for doubt that it was carried out by the corporation. On November 21, 1957 O'Connor wrote one of the stockholders of Mono-Kearsarge (Mono-Kearsarge's exhibit L) that he had asked an officer to check with the company attorney to be sure that the SEC regulations were not being violated by the plan, and that he was consulting another attorney (presumably Alexander H. Walker, Jr.) on the question.

Prior to December 10, 1957 it developed that there were insufficient relinquishments of stock by stockholders to make up the 51% and that it was necessary to add to the 962,000 shares then available for this purpose an additional 250,000-share block from the unissued stock of the corporation. On December 10, 1957 when both blocks of stock were delivered to Boren, Walker already had indicated to O'Connor that in his opinion the transaction involving the 962,000-share block was not a sale but further suggested that unless the shares to be delivered to Boren were for a limited number of nominees, and for investment purposes only, registration would be necessary. However, it was not until December 12, 1957 that Walker put this opinion in writing (plaintiff's exhibit 6). In the meantime, the transfer of the stock to Boren and the transfer by Boren of the oil interests to the corporation had been substantially completed.

The situation of the corporation with respect to these matters then is well demonstrated by O'Connor's letter dated December 11, 1957 to Boren (Mono-Kearsarge's exhibit K). This letter concerned both the 250,000-share block and 962,000-share block. It is clear from this letter that despite the warning signs already received, up to that point

the corporation had been impressed with Boren's idea that the 962,000-share block was "free" stock. Based at least in part on Walker's oral opinion, there apparently was now some real question in the minds of its officers; but the corporation still willing to proceed on Boren's theory, contenting itself with the following mild caution to him:

"As you indicated, we can expect a signed copy of the agreement by the individuals receiving investment stock in the smaller of the two transactions, to the effect that each stockholder receives the stock for investment purposes and agrees to hold the same for the required number of months.

\* \* \* \* \* \*

"The former S. E. C. representative in this area, who now practices here, tells me that he believes the 962,000 shares are also subject to the investment rule controlling sale by your associates. I know you are interested in this point, and you should have your attorney get an expert opinion on the subject."

Mackay testified that he thought the 962,000 shares were not investment stock and that no steps were taken to prevent their transfer. He somewhat naively suggested that the reason that they didn't require investment letters with respect to the 962,000 shares was because they didn't get the full 51% of the stock from the stockholders. Yet, in certain other respects the Court was impressed with Mackay's sincerity. At one time he rejected the suggestion of Mono-Kearsarge's counsel that the corporation did not act as such in procuring the stock for the Boren deal, but that this was accomplished through a committee of stockholders. He said he knew of no such committee and first heard of it at the trial. But a reference to certain other exhibits will further demonstrate that Mono-Kearsarge, as well as Boren, on December 10, 1957, when both blocks of stock were delivered, understood that with regard to the larger block, Boren would accept the larger block as "free"

stock subject to immediate retransfer and that both he and the corporation treated it as such, notwithstanding the question that existed in the minds of the corporation officers concerning the legality of this procedure.

Mono-Kearsarge's exhibits C and D are two receipts signed by Margaret Simpson from the files of Mono-Kearsarge. The first receipt is for 125,000 shares out of the 250,000-share block and this contains the express statement that the signer understood that the stock was for investment purposes only and not for resale or distribution. The other receipt dated the same day acknowledges receipt of 105,000 shares of stock from the 962,000-share block; it is silent as to any limitation on distribution. Simpson was one of Boren's nominees. Presumably, these receipts though dated theretofore, were delivered to the corporation when Boren picked up the stock.

As late as April 18, 1958, the transfer agent of the corporation returned to Veditz Co. certificates Nos. 92A to 94A, inclusive, in the name of Margaret Simpson, with the explanation that these certificates were out of the "investment stock issued in December, 1957 and are not to be transferred until January, 1959 under the agreement which was entered into." (Mono-Kearsarge's exhibit H.) The transfer agent, for that expressed purpose, refused to issue any stock certificates in the names of the transferees D. Lee Chesnut and Howard Williams. His letter added: "The numbers of the stock certificates in the name of Margaret Simpson which cannot be transferred until January, 1959 are 70A to 94A inclusive." Certificates 80A to 94A came out of the 250,000-share block and were covered by the receipt first above mentioned, containing an acknowledgment of transfer limitations. The record shows that the certificate mentioned in the second receipt was delivered to the transfer agent for the issuance of numerous new certificates which were freely transferred by the corporation without any question being raised.

■ The view already has been indicated that an issuer cannot take at face value the assurances of buyers that they buy only for investment purposes when circumstances would show to a reasonable person that these assurances are formal rather than real and when there are preponderant indications that the representations are made to avoid the requirements of law. Much less was Mono-Kearsarge in a position to rely upon the investment theory when its understanding at the crucial time of the transfer was that the stock was not being taken by the recipients solely for investment purposes and when its own words and actions, including its subsequent handling of the stock for transfer purposes, reasonably indicated that the corporation understood a public distribution was being accomplished.

■ What has been said largely disposes of the related contentions that the transfer of the 962,000-share block constituted a mere "gift" between individual stockholders of the corporation on the one hand and Boren and his associates on the other, thereby making the stock "free" and not subject to registration. Additional fill-ins are these: It further appears that the minutes of the board of directors concerning the December 10, 1957 meeting, related the assignments of oil and gas interests from Boren exclusively to the issuance of the 250,000 shares by the corporation. The receipt given to Boren was to the same effect. The forms of these were inconsistent with the proposals repeatedly presented to the stockholders that they relinquish 51% of their stock to be transferred by the corporation in return for the oil and gas interests. Neither the form of the minutes nor that of the receipt changed the patent facts that the oil and gas interests, part of which had been assigned to the corporation even before December 10, 1957 (see Mono-Kearsarge's exhibit L, dated November 21, 1957) were all assigned in exchange for the controlling stock interest in the corporation; that the corporation arranged for stockholders to return to it the bulk of the necessary stock to effect this transaction; that to make up the balance of control the corporation issued 250,000 additional shares; that the consideration for such control in its entirety went to the corporation as a result of negotiations carried on, controlled and consummated by the corporation and that the corporation as a part of such transaction issued both blocks of stock to Boren and his nominees.

■ The transfer to Boren of the 962,000-share block constituted a sale of securities. With respect to both blocks under the definition contained in the Act, Mono-Kearsarge was an issuer, and as to the 962,000-share block there was a public offering. 15 U.S.C.A. §§ 77b(3), 77b(4), 77d(1).

■ Beyond the nominees named by him in the immediate transfer, Boren intended to effect a public distribution of the stock and this intent obviously was shared by his associates and nominees. They did so. They were underwriters within the meaning of 15 U.S.C.A. § 77b(11) in that they purchased from an issue with a view to the distribution of the stock. Securities and Exchange Commission v. Chinese Consol. Benev., 2 Cir., 1941, 120 F.2d 738, certiorari denied 314 U.S. 618, 62 S.Ct. 106, 86 L. Ed. 497; Merger Mines Corp. v. Grismer, 9 Cir., 1943, 137 F.2d 335, certiorari denied 320 U.S. 794, 64 S.Ct. 261, 88 L. Ed. 478; Landay v. United States, 6 Cir., 1939, 108 F.2d 698, certiorari denied 309 U.S. 681, 60 S.Ct. 721, 84 L. Ed. 1024.

Boren testified in his deposition that part of his plan was to interest the public in Mono-Kearsarge stock and that to effectuate this plan, he included Goldstein, an employee of Veditz Co., as one of the nominees with reference to the 962,000-share block. Although Boren in his deposition denied it, the evidence established that he and Collins, then the new president of Mono-Kearsarge, as a result of the control vested in Boren and his nominees, including Collins, delivered

the stock to Josephson in order that it might be sold through Canadian sources. It is reasonable to infer that at the time of this delivery, Goldstein and Josephson envisaged that Veditz Co. and perhaps other New York dealers ultimately would distribute the stock in the United States after it had been channeled through Canada.

■ What was accomplished by Boren, Collins and their associates constituted a violation of the Act. Not only were they underwriters, but they were persons then in control of Mono-Kearsarge. In effect, the term "underwriters" as defined in the Act includes one who has purchased from any person directly or indirectly controlling an issuer or in direct or indirect common control with the issuer, with a view to the distribution of the security in question. 15 U.S.C.A. § 77b(11).

■ It must now be determined whether Veditz Co. and Gravis, Inc. acquired Mono-Kearsarge stock from controlling or commonly controlled persons with a view to distribution to the public under such circumstances as to render them also underwriters for the purposes of the Act. Securities and Exchange Commission v. Kaye, Real & Co., D.C. S.D.N.Y., 1954, 122 F.Supp. 639. If they did not, their primary contention that the transactions in which they were engaged were "dealer transactions" and thus exempt by virtue of 15 U.S.C.A. § 77d(1) would have to be sustained. If they did, their position as underwriters would have required registration of the securities, for the exemption accorded a dealer does not apply when he is acting as underwriter. 15 U.S.C.A. § 77d(1).

Goldstein received 240,000 shares of the so-called "free" stock according to Boren. Part of this was taken in the name of his wife. Josephson testified that a week or two after Collins and Boren visited him, he called up Pennington and was told that Pennington would acquire their shares and make distribution in Canada, taking blocks in the names of various persons. Josephson said that at first Pennington was to sell the stock in Canada but added, "Pennington or Goldstein, I think more likely Pennington, asked me if any brokers in the United States were interested in stock. I told him that it was a listed stock out on the Salt Lake Stock Exchange but I understood that a person by the name of Goldstein was supposed to be interested in the stock here in New York and I would find out more about it. Goldstein gave me Gravis's name and I gave that name to Pennington. * * " Josephson later said that he gave Pennington the name of Veditz also. He further testified that Pennington was to remit the funds received for the stock to Boren and Collins. Even without this direct evidence it rather clearly appears that Pennington and his associates in Canada were mere conduits through which stock was to be distributed in the United States.

Josephson had worked for Veditz Co. before the period in question but he said he "wouldn't call him a client." Veditz testified that no specific proposition was presented to him when Boren and Collins, with Goldstein, first approached him concerning Mono-Kearsarge but that on the strength of their conversation he went up to see "his attorney," Josephson, who told him "the corporation was sound." Josephson further reported to Veditz that someone had called up from Canada and said they had about 200,000 shares and that he, Veditz, would receive a call from Pennington on the subject.

The first meeting between Collins, Boren, Goldstein and Veditz, the latter testified, was around December 28, 1957. Immediately after a second meeting, Veditz said he decided to go through "with the proposition." What proposition this was is not clear but it seems fair to infer that it was to buy Canadian stock, of which he had been told by Josephson. However, Veditz testified that he initially contemplated getting stock from brokers or dealers when he first de-

cided to go ahead, which he said was about the middle of February, 1958.

Veditz testified that nothing was said by Boren and Collins about their having stock that would be on the market, and that he did not know of Goldstein's stock holdings. The reason Boren and Collins gave for their interest, according to Veditz, was to increase the value of the stock so that the power of the corporation to buy other property for stock would be increased. This seems a dubious explanation which should have invited critical inquiry. It was somewhat on a par with Boren's claimed explanation to Mono-Kearsarge that the reason he wanted more than a million shares of its stock then being traded on the Salt Lake Stock Exchange was not that he might in the near future realize its value, but that he could be put in a position to help this "nice little company" for some long-term realization to all of the stockholders, including himself.

On February 28, 1958 Pennington, c/o Guardian Trust Company, Montreal, wrote Veditz Co. (Veditz Co.'s exhibit B) granting it a 30-day option to purchase 200,000 shares of Mono-Kearsarge at 12¢ per share and stating that he was neither an officer, director or controlling stockholder of Mono-Kearsarge, and that he did not own 10% of the outstanding stock and had no connection with the company other than as a stockholder. He said he consulted with Josephson concerning the legality of this acquisition and was told orally that it was legal. Notwithstanding this opinion, Veditz said that prior to the time he closed the transaction, believing that Josephson was an "interested party", he consulted another attorney. He acted upon the latter's oral opinion, which was confirmed in writing to him only after this lawsuit was instituted. It was signed by one Gedalecia who Veditz said was an attorney, but whose letter was not on law office stationery and who did not sign as such. It refers to a conversation of some months before, assumes as true the facts related in Pennington's letter to

Veditz Co. and concludes: "Based solely on the foregoing I have advised you that, in my opinion, you had justifiably relied on the representation of Mr. Pennington and that your transactions were exempt from Section 5 of the Securities Act * * *." The letter adds for good measure the rationalization that "If any facts existed which were unknown to you and could not have been readily discovered by you in the normal course of business, you certainly could not be charged with a *wilful* violation of the Securities or Securities & Exchange acts. * * * *"

In the period February 2, 1958 through April 11, 1958, Veditz Co. sold to investors a total of 608,900 shares of Mono-Kearsarge stock at a price of from 19¢ to 30¢. Cancellation of some of these sales was made totaling 177,500 shares. Accordingly, its net sales to investors amounted to 431,400 shares for $102,-779.60. A substantial part of this stock was acquired by Veditz Co. through Pennington. The number of investors buying from Veditz Co. approximated three hundred. In the sale of the stock the instrumentalities of interstate commerce were used. Veditz said that this company started to sell to customers the middle of February, 1958 under the Salt Lake market, asserting that while he then had no stock tied up, he had talked to Pennington early in February. He testified that he relied upon Pennington's representations, and upon inquiries he made concerning the stability of the company and indicated that both Josephson and Goldstein, as well as Collins and Boren, had concealed the true facts from him. He admittedly made no attempt to find out through the transfer agent of the corporation or from other likely sources where the Pennington stock came from, choosing to accept the formal representations of Pennington couched mainly in the language of Veditz's letter to him, that the stock was not being obtained from a controlling person. He testified that he intended to handle no more Mono-Kearsarge stock.

Gravis knew Goldstein prior to the transactions involved here. He visited Goldstein in Josephson's office once or twice just before or after the sale of the stock. Gravis testified, however, that nothing was discussed on these occasions concerning it. There is no evidence that Gravis and Veditz were acquainted before these transactions occurred or during their course. On February 14, 1958 Pennington wrote Gravis, Inc., from Montreal with repect to the sale of 200,000 shares of Mono-Kearsarge stock. On February 20, 1958 Gravis, Inc. wrote Pennington that before undertaking the sale of these securities it would like to know whether Pennington was or had been an officer, director or controlling stock owner in Mono-Kearsarge and whether he owned 10% or more of its outstanding shares. On February 24, 1958 Pennington replied in the negative and stated, " * * * I havenot been connected with the said company either directly or indirectly in any capacity except as a stock holder." On February 28, 1958 Gravis wrote with reference to the last mentioned letter: "As per our telephone conversation, I understand that you purchased your stock in the open market and that such stock was not controlled." An offer of 10¢ per share was made. This correspondence, as did the letters of Veditz, indicated acquaintanceship with the possible legal consequences of such control; but more, they suggest to me a desire to formally negate any such idea without reasonably exploring the possibility of details to the contrary.

On March 4, 1958 John Steczko wrote from Montreal making indirect reference to the Pennington deal, asserting that the writer and his "associates" also owned "substantial blocks" of these securities and that none of them were in any way connected with the company and an offer to sell for 11¢ per share was included. On the same date, in substantially the same words and apparently on the same typewriter, Lorraine Beaulieu wrote to Gravis, Inc. (Gravis, Inc.'s exhibit H) also from Montreal. Gravis re-

plied to each letter of March 7, 1958 in substantially the same language, setting out arrangements for the purchase of the stock within sixty days. These arrangements were accepted by the sellers by written endorsements on returned copies of the Gravis letters.

On March 19, 1958 Gravis, Inc. delivered checks to Josephson of New York City for the purchase of Pennington's stock. On April 3, 1958 Attorney Gilbert Wallach of New York City gave an opinion (Gravis, Inc.'s exhibit N) to Gravis, Inc., "Based on the information which you have furnished to me, and the correspondence between yourself and Charles Pennington * * * " that the transaction was exempt from registration. The opinion noted that the sale price was 10¢, whereas the day the agreement was made the stock was selling at approximately 15¢ on the Salt Lake market. On April 10, 1958 the Guardian Trust Company of Montreal wrote Gravis, Inc. (Gravis, Inc.'s exhibit P) that 90,000 shares had been paid for by Gravis, Inc. by means of a check sent by it to the bank, such shares being forwarded with the bearer of the letter; and that the balance of 45,000 shares in the Steczko and Beaulieu transactions would be delivered when uncertified checks had cleared.

Gravis said he accepted the representations of the Canadian correspondents at their face value. While inquiry was made concerning the soundness of Mono-Kearsarge no attempt was made by him to find out where the Canadian stock came from or how it happened to be offered under the circumstances indicated. Gravis also testified that he had received an oral opinion concerning the validity of the transaction before he received the written opinion from Wallach and that he acted in good faith believing that the transaction was lawful.

In the period March 25, 1958 through May 7, 1958, Gravis, Inc. sold 1,140,800 shares to investors at prices ranging from 25¢ to 30¢ a share for a total price of $307,605.40. In this period sales of 501,300 shares were cancelled. The net

sale to investors was 639,500 shares for a total proceeds of $167,902.40. These net sales involved some four hundred investors. The greater part of the stock thus sold by Gravis, Inc. was acquired from Pennington and those associated with him. In the sale of the stock the instrumentalities of interstate commerce were used.

In order to have it split up into smaller certificates for delivery to customers, Gravis turned over to Josephson a stock certificate for 195,000 shares which he had acquired through Pennington but which stood in the name of Mrs. Charles Collins. Josephson forwarded it to the transfer agent of Mono-Kearsarge where it was seized by Charles Collins on his authority as president of Mono-Kearsarge. It is presumably still retained by him under the claim that it was improperly released by Josephson to Pennington. At the trial Gravis testified that he intended to sell no further stock but that, unless he were enjoined, he would endeavor to obtain the 195,000-share certificate and have it broken up into smaller shares for delivery to buyers who had already contracted and paid for the stock, in order that those deals might be completed.

Under these circumstances, granting, arguendo, that Josephson's and Goldstein's knowledge was not imputable to Veditz Co., nor Josephson's to Gravis, Inc. (which seems less likely) as a matter of law, both proceeded at their peril as underwriters by reason of having purchased from controlling persons with a view toward distribution to the public. If Pennington and those associated with him were not controlling persons, they were under direct or indirect common control through Boren et al. with the issuer. 15 U.S.C.A. § 77b(11).

■ ■ Veditz and Gravis contend that while this may be so, they did not know of the controlling or controlled position. The defendants are held to have knowledge of those facts which they could obtain upon reasonable inquiry. Probably the facts directly known by them were sufficient to acquaint them with the true situation. If not, they were sufficient to impose upon them the duty of making further inquiry. Under the circumstances, they were not entitled to rely solely on the self-serving statements of Pennington and the other Canadians denying those facts which would have indicated that they were representing controlling persons, or were under common control with an issuer. With all these red flags warning the dealer to go slowly, he cannot with impunity ignore them and rush blindly on to reap a quick profit. He cannot close his eyes to obvious signals which if reasonably heeded would convince him of, or lead him to, the facts and thereafter succeed on the claim that no express notice of those facts was served upon him. The transactions whereby Veditz Co. and Gravis, Inc. publicly distributed substantial portions of the 962,000-share block were not exempt, and such distributions in the absence of registration were unlawful.

■ The final inquiry must be whether an injunction should issue as prayed for by the plaintiff. The plaintiff's position seems to be that illegality of the transactions being established, an injunction should issue somewhat as of course. The defendants argue that whatever the transactions were which may have constituted the improper ones, they have been completed. Since the purpose of an injunction is preventative rather than punitive, they say no purpose would be served except to adversely affect innocent investors and to furnish the basis for revocation of registrations which would have unjust repercussions beyond the control of the Court.

It is provided in 15 U.S.C.A. § 77t(b):

"Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, it may in its discretion, bring an action in any district court of the United States, United States court of any Terri-

tory, or the United States District Court for the District of Columbia to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. * * *"

■ It is to be noted that the failure to register a security in accordance with the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., of which plaintiff complains here, arises under provisions of law different than those governing registration of securities on a national securities exchange which are found in the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq. As far as the record discloses, Mono-Kearsarge stock is registered for the purpose of being listed on the Salt Lake Stock Exchange. An injunction would not, in and of itself, affect that registration. The Commission has the power, however, after appropriate notice and opportunity for hearing to suspend such registration for exchange purposes upon a finding that the issuer has failed to comply with any provision under "this chapter * * *", referring to the Securities Exchange Act of 1934. Only with respect to brokers or dealers, do I find provision similar to the following, authorizing the Commission as an alternative to proof before it of wilful violation to accept a court injunction as a basis for revocation of registration:

"* * * The Commission shall, after appropriate notice and opportunity for hearing, by order deny registration to or revoke the registration of any broker or dealer if it finds that such denial or revocation is in the public interest and that (1) such broker or dealer whether prior or subsequent to becoming such, or (2) any partner, officer, director, or branch manager of such broker or dealer (or any person occupying a similar status or performing similar functions), or any person directly or indirectly controlling or controlled by such broker or dealer, whether prior or subsequent to

becoming such * * * (B) has been convicted within ten years preceding the filing of any such application or at any time thereafter of any felony or misdemeanor involving the purchase or sale of any security or arising out of the conduct of the business of a broker or dealer; or (C) is permanently or temporarily enjoined by order, judgment, or decree of any court of competent jurisdiction from engaging in or continuing any conduct or practice in connection with the purchase or sale of any security; or (D) has willfully violated any provision of the Securities Act of 1933, or of this chapter, or of any rule or regulation thereunder. * * *" (15 U.S.C.A. § 78o(b)).

My attention has been called to only one case where the relationship between the registration revocation provisions and the granting of an injunction has been expressly considered. Securities and Exchange Commission v. Torr, D.C.S.D.N.Y.1938, 22 F.Supp. 602 (former appeal 2 Cir., 87 F.2d 446). There are a number of other special problems confronting courts in determining whether an injunction should or should not be granted under the Securities Act which seem to have received little attention. I have therefore taken the liberty of summarizing below what I believe to be the governing principles deducible from the terms of the pertinent statutes, general principles of equity and the few cases that have discussed the problem.

■ 1. The fact that the statute is in form mandatory in providing that an injunction "shall" issue upon a proper showing does not make the granting of an injunction obligatory upon the Court, or as a matter of course even though a violation of the law has been established; general principles of equity should be guides in its granting or refusal. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754.

■ 2. If at about the time of the commencement of the action a defendant

was neither engaged in, nor about to engage in, acts or practices constituting, or which will constitute, a violation of the Act, or rules or regulations thereunder, an injunction should be denied.

3. The continuation, after suit is threatened or brought, of practices which constitute the completion or consolidation of illegal transactions already substantially completed may indicate a defendant's present engagement in violation of the law for the purpose of the injunction; and from past violations, even though fully consummated at the time of the commencement of an action, the Court may infer that the responsible party is about to engage in other similar transactions in the future with respect to the same or different securities.

4. The mere fact that pendente lite the defendant discontinues violating the Act or promises to refrain from doing so in the future is entitled to little or no weight against the granting of an injunction.

5. An injunction may be granted, and in an otherwise appropriate case should be granted, even though it is not demonstrated that the violations or threatened violations furnishing its basis are wilful in the special sense of being fraudulent, in bad faith or with deliberate intent to violate known requirements of law.

6. In the event acts are of the latter nature, the intent or danger of future violations making the granting of an injunction necessary will be the more readily inferred; but even though violations fall short of those that would be wilful in a criminal sense, the Court may infer from a wanton or even careless willingness to take a chance on the legality of questionable transactions that a defendant is about to similarly violate the Act if afforded an opportunity to do so in the absence of an injunction, equitable grounds for an injunction otherwise being shown.

7. An affirmative showing of threatened irreparable injury to the plaintiff or the public is not essential beyond that which will be implied as a natural result from any failure to appropriately prevent threatened violations.

8. Where an injunction cannot issue without unfairness to a defendant it should be denied on the theory that however important it may be to vindicate the Act the overriding public interest would be to avoid judicial injustice; but where the public interest can be subserved by enjoining future violations without injustice to the defendant, it should not deter the Court from doing so that the self-invited consequences which might be suffered by the defendant, though just, are severe.

9. The possible indirect effects of a decision upon those not parties, while appropriate for consideration by the Court in a general way, may not be deemed controlling, since it would be impossible, if not inappropriate, to evaluate those collateral effects either in and of themselves or in relation to the benefits which indirectly will accrue to others from the enforcement of the Act.

10. One of the considerations to be observed on the problem of possible injustice to the parties before the Court is that an injunction could be accepted by the SEC by virtue of subdivision (c) of 15 U.S.C.A. § 78o as a substitute for a finding on its part of a wilful violation with the result that the dealer defendants could be put out of business. It is not the province of the Court in an injunction suit such as this to determine the precise meaning of the term "wilfully" as used in subdivision (d) concerning revocation of registrations (see Pierce v. Securities and Exchange Commission, 9 Cir., 1956, 239 F.2d 160; Weber v. Securities and Exchange Commission, 2 Cir., 1955, 222 F.2d 822, certiorari denied 350 U.S. 947, 76 S.Ct. 322, 100 L. Ed. 826; Hughes v. Securities and Exchange Commission, 1949, 85 U.S.App. D.C. 56, 174 F.2d 969). If it were of the view that an injunction justifiable in and of itself under the special facts

of a case would be unfairly seized upon by the Commission for the purpose of revoking a registration which would not or could not otherwise be revoked, the Court would hesitate to issue it. However, arbitrary action on the part of a commission is not to be readily apprehended; and it must be recognized that it is the SEC's responsibility in the first instance, not this Court's, to determine whether the public interest would be subserved with justice to the respondent, and in accordance with the statute, by an order of revocation.

11. The burden is upon the defendants to establish that transactions were exempt from the general requirements of the Act, but this does not affect the burden of the plaintiff to prove that an injunction should issue.

■ The corporate defendants are in no position fairly to say that an injunction would be unjust. Despite the absence of a showing herein of fraud or wilfulness in the criminal sense, they accommodated themselves to the plan of Boren, Collins, Goldstein and their associates to accomplish by indirection what legally could have been done only after registration of the securities. That they did this knowing that there was a serious question about the legality of their procedure and were willing to take a chance in view of the rewards offered is abundantly established. Beyond this, it may be suspected that each of the three to some extent was a co-conspirator with Boren, Josephson or Goldstein et al. in wilfully, deliberately and deceptively evading understood requirements of the Act; but mere suspicion does not justify such a finding, and I do not base the conclusions herein reached upon this ground. The plaintiff made no attempt to show that Goldstein had, to the knowledge of the officers of Veditz Co., theretofore engaged in similar shady transactions. It has not been shown that in other transactions prior to those in question any defendant had demonstrated an inclination to violate the requirements of the Act; that the oil and

gas interests conveyed by Boren were worthless or out of proportion in value to the amount of stock recovered; or that in the instant transactions in addition to what I have indicated, there were involved actual deception, fraud, false advertising or other circumstances typically present in registration revocation cases and frequently present when injunctions are issued under the Act. Likewise, the view might be entertained that the knowledge and acts of Goldstein, if not Josephson, are imputable to Veditz Co.; those of Collins, its president, to Mono-Kearsarge. But having determined the illegality of transactions engaged in by each of these corporations independent of the question of imputed knowledge from those who might be said to be in a position antagonistic to that of their principals, resort to that doctrine as the primary base on which to hang an injunction would not be justified.

The Court therefore, is confronted with the hard choice between granting an injunction in the absence of convincing proof of wilfulness in the criminal or analogous sense, with the likelihood of difficult problems to ensue for the defendants in connection with the handling of, or settlement for, the stock of alleged innocent purchasers or other customers, and with the legal possibility of the Commission's basing revocation proceedings on the mere fact that an injunction has issued; and denying an injunction where violation of the Act has been abundantly established, where at least two of the defendants have indicated an inclination to risk further violations if not enjoined; and where all defendants have demonstrated, to put it most mildly, a casual attitude toward compliance, which it is fair to infer will continue as to other securities offering rewards justifying the taking of a further chance unless an injunction issue.

■ Upon this choice, it is believed that there is a duty to issue an injunction. The absence of established wilfulness in the more culpable sense, and the completion of the bulk of the illegal

transactions involving the particular security, which defendants say commend the denial of an injunction, make less likely any action on the part of SEC toward revocation of registration which the defendants infer would be more prejudicial than an injunction; and an injunction would seem to render less necessary or likely the revocation of registration.

It seems clear that unless an injunction issue, the same willingness to take a chance on questionable practices which occasioned this suit will continue on the part of Mono-Kearsarge. After this suit was instituted it continued freely for a time to transfer on its books and issue new certificates for stock out of the 962,000-share block, on the claim that to do otherwise might render it liable to innocent purchasers for value. Upon the plaintiff's application for a temporary injunction its counsel assured the Court that notwithstanding the latter problem, it would make no transfers pendente lite and would maintain the status quo. The Court accepted such assurance and refrained from issuing a preliminary injunction in view of an early trial setting. Immediately before the trial, however, it was reported to the Court, and confirmed by evidence at the trial, that two certificates of the questioned stock had been received by the corporation and new certificates issued in direct disregard of the assurance so given to the Court on the basis of which it stayed its hand.

Without assuming to determine now whether such further action pendente lite was illegal or not, and accepting the corporation's explanation that there was some misunderstanding, the fact remains that something more emphatic than an admonition or request seems necessary in the case of Mono-Kearsarge. Furthermore, Mono-Kearsarge in its answer takes the position that where its stock is in the hands of innocent parties, it will have to make transfers and issue new stock upon request, even though the transactions which resulted in the base transfer were illegal. I will not assume to decide this question either; but there is further indication that questioned transactions will be completed by the corporation largely as it sees fit in the absence of some external restraint. An injunction will at least assure that in making decisions as to its duties to stockholders it will use more care and circumspection than it has in the past in evaluating its duties to the public.

A similar situation exists with regard to Gravis, Inc. Gravis testified that his company has no intention to further deal in Mono-Kearsarge stock but that it will, unless restrained, endeavor to obtain from Collins the 195,000-share certificate which Collins now holds, and will persist in delivery of certificates based thereon to persons who already have made purchases of the questioned stock from him. It, too, should proceed with whatever is right in this respect with more than the circumspection it employed in the base transaction. This can be appropriately assured by an injunction.

The necessity of an injunction in the case of Veditz Co. is not so clearly indicated. Yet, the primary difference between it and the other two defendants is that Veditz Co. was fortunate enough to have completed all of the deliveries of stock which it intended to sell shortly prior to the institution of this action. I do not believe this circumstance should be determinative. As between it and Gravis, Inc., its responsibility in carrying on the prohibited transactions was greater and at least as clearly, if not more clearly shown, because of the direct participation of its own employee and the closer contact with other personnel of the scheme by Veditz. Moreover, circumstances of its prior participation make it fair to suppose that unless enjoined it, with the continued help of such people as its employee Goldstein, will continue to indulge in the loose practices of the instant case, if not involving Mono-Kearsarge stock, then with other securities offering similar inducements.

I conclude that it did reasonably appear to the Commission upon the commencement of this action that the defendants were engaged and were about to engage in acts and practices constituting a violation of the Securities Act; and that a proper showing was made at the time of trial, as is more particularly indicated above, for the granting of a permanent injunction, the form of which will be settled upon plaintiff's motion.