SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,

v.

BOND AND SHARE CORPORATION
et al., Defendants.

Civ. No. 9528.

United States District Court
W. D. Oklahoma.

Dec. 30, 1963.

---

Peter A. Dammann, Gen. Counsel, O. H. Allred, Regional Administrator, Thomas W. Ráe, M. David Hyman and David B. Bliss, Washington, D. C., for Securities and Exchange Commission.

Robert E. Shelton, Oklahoma City, Okl., for Bond and Share Corp., Dixie Lumber Co., Graves Lumber Co., Mid-Central Petroleum Corp., Namsa, Inc., Petroleum Finance Corp., Plains Petroleum Corp., Resources Engineering, Inc., Americrude, Inc., United Oil Corp., Forrest Parrott and Donald Parrott.

Sidney B. Josephson, New York City, for Max V. Schoenwald.

Monroe C. Francis, Oklahoma City, Okl., for Hydramotive Mfg. Corp. and Hydramotive Corp.

Hindry, Erickson & Meyer, Denver, Colo., for Forrest Parrott and Donald Parrott.

Brown & Brown, Oklahoma City, Okl., Weinstein, Muilenburg, Waggoner &

Bledsoe, Charlotte, N. C., for Robert Morrison and Morrison & Co., Inc.

John V. Holmes, pro se.

Durward E. Willis, pro se.

Ames, Daugherty, Bynum, Black & Rogers, Oklahoma City, Okl., for Walter Allen Raleigh, dba Raleigh Securities Co.

Crumpacker, Burbach & Abrahamson, Hammond, Ind., for George Slack.

General Securities Corp., pro se.

Thomas J. O'Connor, pro se.

Jules Arfield, default.

Robert I. Allen, default.

DAUGHERTY, District Judge.

This is an action brought by the United States Securities and Exchange Commission to enjoin the defendants from the further offer and sale of the common stock of Hydramotive Corporation in violation of certain of the registration (Section 5 of the Securities Act, 15 U.S.C. § 77e) and anti-fraud provisions (Section 17 of the Securities Act, 15 U.S.C. § 77q, Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, and Rule 10b–5 thereunder, 17 CFR 240.10b–5) of the federal securities laws. This action is brought by the Commission pursuant to its authority under those acts—Section 20 of the Securities Act, 15 U.S.C. § 77t, and Section 21 of the Securities Exchange Act, 15 U.S.C. § 78u. This Court has jurisdiction of this action under Section 22(a) of the Securities Act of 1933, as amended 15 U.S.C. § 77v, and Section 27 of the Securities Exchange Act of 1934, as amended 15 U.S.C. § 78aa.

The issues between the parties, briefly stated, are that the plaintiff contends that the defendants have sold in interstate commerce and if not enjoined would further sell in interstate commerce, stock owned or held by them in the Hydramotive Corporation, which stock is not registered with the SEC as required by law, and further that such stock has been and if not enjoined will be sold in the future through fraudulent means in the form of a device or scheme to defraud the public and by untrue statements of material facts and omissions to state material facts regarding the Company, its operation and stock, which untrue statements were published, made and distributed to the public as an inducement to the public purchasing stock of said Company.

Those defendants appearing defend on the grounds that 1,000,000 shares of the stock involved were registered with SEC in 1955 by the predecessor company to the Hydramotive Corporation and that their dealings involved only this stock. Further, that their sales were and are exempt from registration since their transactions were not accomplished by them as an issuer or underwriter as defined by the Securities Act. For further defense, the defendants generally deny that any device or scheme to defraud was or is involved and deny that any untrue statements of material facts were made or omitted with reference to the Company and its operations and activities.

In 1954 the Cal-Moab Uranium Corporation was incorporated and in 1955 a stock offering of 1,000,000 shares amounting to $10,000 was made under an exemption from registration afforded by Section 3(b) of the Securities Act of 1933 and Regulation A promulgated thereunder, 15 U.S.C. § 77c, 17 CFR § 230.220, (See Plaintiff's Ex. 70). This issue of securities was underwritten by the defendant Petroleum Finance Corporation, whose president was the defendant Forrest Parrott (Regulation A File, Plaintiff's Ex. 70). The above was the only filing made with the Commission. There were approximately 7,145,000 shares outstanding including the above mentioned 1,000,000 Regulation A stock (Regulation A File, Plaintiff's Ex. 70). Shortly after the sale of its stock in reliance on the Regulation A exemption, Cal-Moab became a corporate shell and was without assets up to and including June 24, 1961. After 1955 the great majority of the outstanding stock of Cal-Moab (approximately 4,366,041 shares) came under the control of the defendants Forrest and Donald Parrott.

The Parrotts held their Cal-Moab stock in the names of various of their nominees,

including members of their families and the defendants Dixie Lumber Company, Graves Lumber Company, Inc., Mid-Central Petroleum Corporation, Namsa, Inc., Petroleum Finance Corporation, Plains Petroleum Corporation, Resources Engineering, Inc., Bond and Share Corporation, Americrude, Inc., and United Oil Corporation. These nominee holdings are fully demonstrated by bank accounts, bank signature cards, bank deposits and income tax returns in evidence respecting these Companies, all of which activities were controlled by the Parrotts. The evidence shows that the Parrotts indiscriminately used the suffix "Company" and the suffix "Corporation", or "Inc." in dealing with said nominee Companies, but however suffixed the Companies were clearly nominees of and used and controlled by the Parrotts in their stock dealings.

In late 1959 or early 1960, the defendant John Holmes mailed inquiries to approximately 2,000 people and companies indicating his interest in low stock companies. The defendant Forrest Parrott or one of his nominee companies, responded to this inquiry. As a result Holmes met Forrest Parrott for the first time in January or February, 1960, in Oklahoma City. Cal-Moab was discussed. The understanding or arrangement effected between Forrest Parrott and Holmes at this meeting is not crystal clear to the Court from their testimony but it is clear that Forrest Parrott soon thereafter and over a period of time subsequent thereto extending into July, 1961, eventually transferred or caused to be transferred 1,152,-500 shares of Cal-Moab stock to Holmes. Moreover, it is clear that no monetary or property consideration passed between these parties with reference to this transfer of stock. Holmes at the time had a background of dealing in, selling and promoting the sale of stock in and for various companies so it becomes apparent under all the circumstances that the transfer of stock from Forrest Parrott to Holmes was made in consideration that Holmes activate or assist to activate the Company by some means.

Early in 1961 Forrest Parrott suggested to the defendant Durward E. Willis that he meet with John Holmes. This was the first meeting between Willis and Holmes and it took place in Charlotte, North Carolina, then the residence of Holmes. Willis, who had a record of convictions for mail fraud and confidence game, claimed to have developed plans and specifications for a revolutionary hydraulic drive low-cost car and a revolutionary tire that would last 100,000 miles and be free from blow-outs, punctures, etc.

As a result of this meeting Holmes, Willis and Forrest Parrott collaborated to elect new officers in Cal-Moab, to change the name to Hydramotive Corporation, and to cause said Company to purchase certain interests in the Willis car and tire. Forrest Parrott's attorney conducted the necessary stockholders meeting, which was held in Oklahoma City on June 24, 1961, in his office. Donald Parrott, son of Forrest Parrott, gave assistance in arranging for the stockholders meeting and in the preparation of its minutes. Forrest Parrott furnished the form of proxy and Holmes and Willis caused them to be printed or duplicated in the needed quantity. Forrest Parrott and Donald Parrott caused a friend of theirs in Denver, Colorado, named Alfred O. Brehmer, to take care of the mailing of the notices of stockholders' meeting and proxies to the stockholders of Cal-Moab, in which mailing was included literature regarding the car and the tire prepared and furnished by Holmes and Willis.

Following reorganization Hydramotive Corporation issued 2,500,000 shares of stock, most of which went to Willis or to the control of Willis for royalty rights on the car and tire.

At this time the stock of Cal-Moab, and hence the stock of Hydramotive Corporation was not registered with the Securities and Exchange Commission, as required by Section 5 of the Securities Act, 15 U.S.C. § 77e. The 1,000,000 Regulation A issue of 1955 was terminated on May 23, 1955, under Rule

224 of the SEC. See Plaintiff's Exhibit 70 (last page). Furthermore, the evidence does not establish how much of this Regulation A stock was acquired by the Parrotts nor does the evidence show that any of the stock of this issue was either transferred to Holmes or sold by the Parrotts through Raleigh or otherwise. At any rate, any of this stock acquired by the Parrotts in 1955 or after Cal-Moab became dormant came to or was held by a control person and any redistribution of the same would require a new registration especially since the original issue in 1955 was in connection with the development of mining properties and any redistribution in 1961 was in connection with the manufacture and sale of a car and tire. The need for public disclosure afforded by the registration provisions of the Securities Act of 1933 and rules promulgated thereunder existed in connection with the 1961 sales.

Following the reorganization of the Company as aforesaid, the Company made efforts to buy a plant in Chicago, Illinois, and one in Georgia. Both ventures in short order failed of accomplishment. Jules Arfield, a friend of Holmes who was in the business of brokering and selling stock, at this time organized the American Securities Company in Charlotte, North Carolina. Holmes sold some of his Hydramotive Corporation stock to this Company and took a note therefor which was never paid, and then sold some of his Hydramotive Corporation stock through said Company. This Company employed high-pressure telephone sales techniques and distributed through the mails a large quantity of the literature prepared by Holmes and Willis on the car and tire.

Holmes made the acquaintance of the defendant Morrison, who owned and controlled Morrison & Company, a brokerage firm in Charlotte, North Carolina. Morrison was a respected, well-educated and well-fixed citizen of Charlotte, North Carolina. Holmes became a customer of the Morrison firm. As Morrison was leaving for a month's trip to Europe, Holmes sold him 30,000 shares of Hydramotive Corporation stock for $30.00, at which time the stock was then being sold for considerably more per share. Morrison lent money to the American Securities Company and one of his employees went to work for said Company. His brokerage firm sold Hydramotive Corporation stock. Morrison still has over 30,000 shares of Hydramotive Corporation stock in his possession.

In all Holmes distributed by various means including dormant companies which he controlled a total of 613,650 of the 1,152,500 shares received from Forrest Parrott and received consideration in excess of $100,000.00.

Forrest Parrott went to Charlotte, North Carolina, following the corporate reorganization and was in the company of Willis and Holmes on at least one occasion, and with the defendant Raleigh was with personnel connected with the defendant American Securities Company on at least one occasion in Washington, D. C.

When the Hydramotive Corporation stock was being sold about the country, principally through the activities of Holmes and the American Securities Company, Forrest Parrott and Donald Parrott through their nominee companies and members of their families, sold and disposed of large quantities of their stock held in Hydramotive Corporation, and did so to and through a broker in Baltimore, Maryland, the defendant Raleigh, who was an acquaintance of Forrest Parrott. Raleigh bought large blocks of such stock (259,500 shares) from Forrest and Donald Parrott through their nominee companies and members of their families over a period of time and sold it to various dealers about the country. He kept a small amount for himself (wife), some of which he has sold and some of which she still owns. Except for a few small sales he ceased his activities upon reading a news story adverse to Hydramotive Corporation.

In aid of the public distribution of Hydramotive Corporation stock, attractive literature was prepared by Holmes

and Willis regarding the car and tire which was false and highly misleading in the following respects:

(1) That the car would be free from the necessity of repairs by reason of its design and construction.

(2) That the retail price of the car would be as low as $1200.00.

(3) That the car would negotiate a curve faster and safer than any other automobile.

(4) That prototype models of the car were going into production.

(5) That the tire would be free from blow-outs, punctures, slow leaks, flat tires, stone bruises, rim cuts, blisters, flat spots and tire changes, and would not be affected by road heat.

(6) That the tire would last 100,000 miles.

(7) That two investment firms with combined resources of $450,000,000.00 had tentatively committed $100,000,-000.00 each to the manufacture and sale of the Hydramotive cars.

(8) That Durward E. Willis held mechanical and electrical engineering degrees from Columbia University and was a prominent mechanical and electrical engineer.

And said literature was false and highly misleading in omitting and failing to state the following material facts:

(1) That there was in existence only one unfinished prototype body of the car in California.

(2) That the Company did not have on hand or assurances of sufficient funds and facilities with which to produce any models of the Hydramotive cars.

(3) That Durward E. Willis, designer of the car, had a criminal record for mail fraud and confidence game.

The evidence before the Court, including that of expert witnesses, establishes very clearly that a hydraulic drive automobile is not new or revolutionary in the automobile industry, but rather has been extensively explored and tested for many years by major automobile manufactur-

ers. It is quite definite that automobiles of this design and construction can and have been built but difficulties of an economic nature exist in the high cost of constructing this type of automobile and difficulties exist in the considerable noise encountered in the hydraulic drive system. Moreover, the evidence indicates that a hydraulic type car would not be free from repairs, that such car would not necessarily negotiate a curve faster and safer than any other car, and the evidence definitely establishes that such a car could not be retailed for as low as $1200.00 under any circumstances but to the contrary the manufacture of this type of car would entail excessive and prohibitive costs when compared with the type of car now marketed. The evidence further establishes that Hydramotive Corporation by and through the efforts of Willis and those associated with him, had never constructed a prototype model but only an unfinished and untested body which was in the garage at the home of a son of Willis in California, and that their efforts in connection with manufacturing or obtaining necessary parts and features of the car were of little significance and substance. The evidence further shows that the tire would be greatly affected by road heat and would not be free from blow-outs, punctures, etc., and would not last 100,000 miles, but to the contrary by reason of being affected by road heat would be susceptible to blow-outs and other difficulties and would last but a few thousand miles at most before such difficulties ensued. The evidence further shows that the Hydramotive Corporation had no appreciable funds on hand or assured with which to manufacture the car or tire, and that such money as they did have with which they negotiated for the purchase of the plants in Illinois and Georgia and otherwise operated were obtained from the sale of Hydramotive Corporation stock which had been transferred to Holmes by Forrest Parrott and by him either individually or through companies he controlled (Science Inv., Inc. and American Uranium) marketed to the pub-

lic through American Securities Company and the Morrison Brokerage firm and in one or more other means. In other words, the Hydramotive Corporation did not have funds with which to carry out its assertions, but rather was using such assertions to raise money through the sale of stock with which at most it could enter into promised operations which involved impractical and disproven car and tire theories and principles.

Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, provides in part as follows:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.
* * *

"(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, provides as follows:

"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

"(b) It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

"(c) The exemptions provided in Section 77c of this title shall not apply to the provisions of this section."

The Court finds and concludes that no registration statement covering the Hydramotive Corporation stock or any of it was filed or in effect as required by Sec-

tion 5 of the Securities Act of 1933, 15 U.S.C. § 77e, during the distribution of its stock by the defendants or any of them to the public in 1961.

■ The Court further finds and concludes that the offering and distribution of the stock of the Hydramotive Corporation by the defendants Holmes, Willis, the Parrotts, Hydramotive Corporation, Hydramotive Manufacturing Corporation, Arfield, Schoenwald, Allen and American Securities Company, later known as American Capital Corporation, violated the anti-fraud provision of the Securities Act of 1933 by reason of the false and misleading literature and assertions made in connection therewith as above set forth.

The Court further finds that the said unregistered stock and the false and misleading literature were distributed to the public through the use and means of the facilities of interstate commerce and the mails.

■ The defendants generally claim that their sales were exempt transactions under the provisions of Section 4(1) of the Securities Act of 1933, 15 U.S.C. § 77d. The burden rests upon the defendants to establish such exemption. S.E.C. v. Ralston Purina Company, Inc. (1953) 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494.

■ The terms of an exemption must be strictly construed against the claimant of its benefit. S.E.C. v. Sunbeam Gold Mines Company (9 Cir.–1938) 95 F.2d 699.

Section 4(1) of the Securities Act of 1933, 15 U.S.C. § 77d, provides in part as follows:

"The provisions of section 77e of this title shall not apply to any of the following transactions:

"(1) Transactions by any person other than an issuer, underwriter, or dealer; transactions by an issuer not involving any public offering."

Section 2(11) of the Securities Act of 1933, 15 U.S.C. § 77b, defines an "under-writer" and an "issuer" in the following manner:

"(11) The term 'underwriter' means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term 'issuer' shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."

Rule 405 of the Regulations promulgated by the Securities and Exchange Commission under the Securities Act of 1933, defines the word "control" as follows:

"The term 'control' (including the terms 'controlling,' 'controlled by' and 'under common control with') means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405(f).

See Securities and Exchange Commission v. Culpepper, (2d Cir.–1959) 270 F. 2d 241.

The House Committee Report, 73rd Congress, 1st Sess., 14 (1933), noted as follows with reference to "control" as the term is used in the Securities Act of 1933:

"The concept of control herein involved is not a narrow one, depending upon a mathematical formula of 51% of voting power, but is broadly

defined to permit the provisions of the act to become effective wherever the fact of control actually exists."

In treating with the meaning of the word "control", as used in the Securities Act of 1933, the Court of Appeals for the Tenth Circuit in Stadia Oil & Uranium Company v. Wheelis, 251 F.2d 269, said:

"The statute does not define the terms 'controls,' 'controlled,' or 'controlling.' These terms should be given a broad definition to permit the applicable provisions of the Act to become effective wherever the fact of control actually exists."

In a somewhat similar legislative use of the word "control" the United States Supreme Court in Rochester Telephone Corporation v. United States, (1939) 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147, had this to say:

"Investing the Commission with the duty of ascertaining 'control' of one company by another, Congress did not imply artificial tests of control. This is an issue of fact to be determined by the special circumstances of each case. So long as there is warrant in the record for the judgment of the expert body it must stand. The suggestion that the refusal to regard the New York ownership of only one third of the common stock of the Rochester as conclusive of the former's lack of control of the latter should invalidate the Commission's finding, disregards actualities in such intercorporate relations."

 It is apparent that Forrest Parrott (and Donald Parrott) took ostensible measures to avoid having the character of or the appearance of control persons of the newly reorganized Hydramotive Corporation, or being connected with its management. Such measures, however, should not and cannot free them from the natural consequences of their activities in assisting and collaborating in the device and scheme whereby the investing public was defrauded. Standard Oil Company of Cal. v. Moore, (C.A.9–1958) 251 F.2d 188; Soloman v. United States (C.A.6–1960), 276 F.2d 669; Lesnik v. Public Industrial Corporation, (C.A.2–1944), 144 F.2d 968. In Stadia Oil & Uranium Company v. Wheelis, supra, the Court of Appeals for the Tenth Circuit said:

"It is an old maxim of the law that a person will not be permitted to do indirectly what he cannot do directly. If a subterfuge, such as that employed by Stadia, is effective to avoid the Securities Act, then that Act which is designed to protect investors fails in its purpose."

When Forrest Parrott made his arrangement with Holmes in Oklahoma City and later brought Willis and Holmes together, he was clearly in control of Cal-Moab, from which Hydramotive Corporation was thereafter born. After the officers and company name were changed, he still owned and controlled a clear majority of the stock, or with Holmes and Willis did so. An escrow agreement was received in evidence by which Forrest Parrott claims to have divested himself of 3,800,000 shares of stock in Hydramotive Corporation. This escrow agreement was only signed by the aforementioned Alfred O. Brehmer as escrow agent. This escrow agreement did not come to light until after both Brehmer and Forrest Parrott had been investigated by the plaintiff. It is the belief of the Court under the circumstances that this escrow agreement was not drawn on May 23, 1961, the date thereof, but after the SEC investigation was initiated. Brehmer admitted that over 2,000,000 of the shares were not received by him until months after the date of the escrow agreement and terms of the escrow agreement were not followed in the voting of the stock by proxy on June 24, 1961. Further, during the initial SEC investigation both Brehmer and Forrest Parrott failed to mention the escrow agreement.

 Defendants Forrest Parrott and Donald Parrott were "issuers" as that term is used in Section 2(11). They,

through their nominees, directly controlled Cal-Moab at and after the time that the arrangement was made with Holmes in Oklahoma City whereby he received a large block of stock. They, through their nominees, directly controlled Cal-Moab at the time of its name change and election of new officers in which they actively assisted. They, through their nominees, under all the circumstances, were thereafter under indirect common control of Hydramotive Corporation with Holmes and Willis.

Holmes was an "underwriter", as defined in Section 2(11) of the Act, since he obtained his stock in Cal-Moab from an issuer (Forrest Parrott), a control person of Cal-Moab, with a view to the distribution of such stock. In addition, Holmes was an "issuer" following reorganization of the company as Hydramotive Corporation, since under the evidence by his acts and conduct he was under common control with the issuer.

Willis was an "underwriter" within the provisions of Section 2(11) since he participated in the underwriting operation of Holmes. S. E. C. v. Chinese Consolidated Benevolent Assn., Inc., (2 Cir.–1941) 120 F.2d 738; certiorari denied 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497.

Morrison and American Securities Company who purchased stock from Holmes with a view to distribution, and Raleigh who purchased stock from the Parrotts with a view to distribution, were each "underwriters" under Section 2(11) of the Act. They each purchased stock with a view to distribution from a control person and each is chargeable with knowledge of those facts. Each could have obtained information upon reasonable inquiry showing the control status of the person from whom each purchased stock with a view to distribution. Each had the duty under the circumstances to make a reasonable inquiry and each is charged with knowledge of those facts which a reasonable inquiry would have disclosed. S. E. C. v. Mono-

Kearsarge Consolidated Mining Company, (10 Cir.–1958) 167 F.Supp. 248.

The plaintiff by its evidence and under all the circumstances presented by the evidence, has sustained its burden to show that all the defendants violated the registration provisions of the Securities Act and that all the defendants except Morrison and Raleigh violated the anti-fraud provisions of the Securities Act. The defendants by their evidence and under all the circumstances presented by the evidence, have not sustained their burden to establish that their transactions were exempt under the Act. Nor have the other defenses been established by the evidence.

Defendants Forrest Parrott, Donald Parrott, Holmes and Willis and the nominee companies of the Parrotts (listed in the fifth paragraph hereof) should be enjoined in view of their violations or participation in violations of the registration and anti-fraud provisions of the Securities Act.

Defendant Hydramotive Corporation and Hydramotive Manufacturing Corporation likewise should be enjoined by reason of their corporate participation in such violations above mentioned.

Defendants Jules Arfield, Max V. Schoenwald, Robert Allen, American Securities Company, later known as American Capital Corporation, having been duly served with summons and complaint herein but having failed to answer or otherwise appear, should be enjoined by reason of their violations of the registration and anti-fraud provisions of the Securities Act.

The defendants Morrison and Raleigh have violated the Act in distributing unregistered stock, but it is believed from the evidence that both were victimized, Morrison by Holmes and Raleigh by Forrest Parrott. Further, since they ceased to engage in acts or practices constituting a violation of the Act shortly after they started operations, and upon receiving information adverse to the stock and prior to the commencement of this action, an injunction should

98

not issue against them, provided, that within 15 days from the date hereof each voluntarily surrenders all shares of stock held by or for him in the Hydramotive Corporation or Hydramotive Manufacturing Corporation with his affidavit that all such surrendered stock is all that is owned by or for him in either corporation. Such surrender shall be to the Clerk of this Court. S. E. C. v. Mono-Kearsarge Consolidated Mining Company, supra. Otherwise, an injunction should issue against them.