**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**SHATTUCK DENN MINING CORPORATION, Willard J. LaMorte, Benjamin Perlen, L. J. Forget & Co., Ltd., L. J. Forget (Bahamas), Ltd., Farrell Vincent, Defendants.**

No. 68 Civ. 73.

United States District Court
S. D. New York.

April 2, 1968.

Mahlon M. Frankhauser, Regional Administrator, Securities and Exchange Commission, New York City, for plaintiff; Arthur Goldman, David B. Bliss, Donald N. Malawsky, Marvin G. Pickholz, New York City, of counsel.

H. A. and C. E. Heydt, New York City, for defendant Shattuck Denn Mining Corporation; Alan Palwick, New York City, of counsel.

Doman & San Filippo, New York City, for defendant Willard J. LaMorte; Nicholas R. Doman, Augustin J. San Filippo, New York City, of counsel.

## OPINION

COOPER, District Judge.

In this action the Securities and Exchange Commission (hereinafter SEC) seeks to have the Court enjoin the six defendants from further violations of various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 and the rules and regulations promulgated by the SEC thereunder.

Since the inception of these proceedings, one defendant, Benjamin Perlen, has consented to the entry of final judgment against him, and as to three others, L. J. Forget & Co., Ltd. (hereinafter Forget), L. J. Forget (Bahamas), Ltd. (hereinafter Forget Bahamas), and Farrell Vincent, default judgments have been entered against them.

We now consider the issue whether, on the basis of the present record, this Court should grant, in whole or in part, the SEC's motion for the issuance of a preliminary injunction enjoining (a) defendant Willard J. LaMorte (hereinafter LaMorte) from offering for sale and selling and delivering after sale the stock of Shattuck Denn Mining Corporation in further violation of section 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c); (b) defendants LaMorte and Shattuck Denn Mining Corporation (hereinafter Shattuck) from further violating the antifraud provisions of section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and rule 10b–5, 17 CFR 240.10b–5, thereunder; (c) defendant LaMorte from further violating the reporting requirements of section 16(a) of the Securities Exchange Act, 15 U.S.C. § 78p(a), and ordering him to file revised form 4's to accurately reflect changes in his ownership of Shattuck stock.

■ On a motion for a preliminary injunction it is necessary for the Court to find that the "petitioning agency [has] presented a strong prima facie case to justify the discretionary issuance of the interlocutory restraint." SEC v. Boren, 283 F.2d 312, 313 (2d Cir. 1960); SEC v. Broadwall Securities, Inc., 240 F.Supp. 962 (S.D.N.Y.1965); Cf. SEC v. Bennett & Co., 207 F.Supp. 919 (D.N.J.1962) ("sufficient prima facie case"). A showing of threatened irreparable injury is not required. SEC v. Torr, 87 F.2d 446 (2d Cir. 1937); SEC v. Broadwall Securities, Inc., supra; SEC v. General Securities Co., 216 F.Supp. 350 (S.D.N.Y. 1963); SEC v. Mono-Kearsarge Consolidated Mining Co., 167 F.Supp. 248 (D.Utah 1958); But see, SEC v. Capital Gains Research Bureau, Inc., 300 F.2d 745 (2d Cir. 1961), reversed on other grounds, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

■ In deciding whether an injunction should issue, the critical question for the Court is whether there is "a reasonable expectation" of further violations in the future. SEC v. Culpepper, 270 F.2d 241, 249 (2d Cir. 1959). The cessation of the alleged illegal activities does not preclude the issuance of a preliminary injunction. See, SEC v. Boren, supra; SEC v. Culpepper, supra; SEC v. Keller Corp., 323 F.2d 397 (7th Cir. 1963); SEC v. Broadwall Securities, Inc., supra; SEC v. General Securities Co., supra.

### (a) The Registration Provision

The SEC contends that from August, 1966 through March, 1967, LaMorte delivered 78,078 shares of Shattuck stock to defendants Forget, a Canadian broker-dealer, and Forget Bahamas, a Bahamian broker-dealer; that 68,800 of these unregistered shares were in turn distributed to various brokers and dealers in the United States for further sale to the investing public; and for the reason that LaMorte, Shattuck's director-president, was "in control of Shattuck" (LaMorte's Memorandum of Law, p. 10), Forget and Forget Bahamas were underwriters within the meaning of sections 2(11), 15 U.S.C. § 77b(11), and 4(1), 15 U.S.C. § 77d(1), of the Securities Act.

LaMorte, while agreeing that 78,078 shares of Shattuck stock [1] were delivered to brokerage accounts with Forget and Forget Bahamas, asserts that these transfers were made "to take advantage of the more liberal margin requirements in those areas," and not for the purpose of sale (LaMorte's Affidavit, p. 3). LaMorte further alleges that, except for the unauthorized sales of 13,200 shares,[2] he has no knowledge of the sale of any stock from the Forget or Forget Bahama accounts. To support this contention, LaMorte has set forth both the status and physical locations of all shares, as of October 31, 1967, in which he has a beneficial interest, including those not transferred to the Forget firms [3] (SEC's

1. LaMorte contends that of the 78,078 shares delivered only 30,073 shares are beneficially owned by him (LaMorte's Affidavit, pp. 3–4).

2. LaMorte states that the Willard J. LaMorte Partnership, consisting of seven partners including LaMorte, made a two year personal loan of 12,500 shares of Shattuck stock to defendant Farrell Vincent, president of Forget and Forget Bahamas. These shares were loaned to Vincent "on condition and with the assurance by him that they would not be sold or otherwise disposed of." LaMorte affirms that he has not received any proceeds from these alleged unauthorized sales. It is alleged that the remaining 700 shares were sold due to a "misunderstanding" (LaMorte's Affidavit, pp. 4–6).
The SEC alleges it was informed by Vincent that the 12,500 shares were delivered to him "without restriction as to their use or disposition" (Adolph's Affidavit, SEC Exhibit C, p. 2).

3. LaMorte admits that 10,228 shares of Shattuck stock were sold from the LaMorte Partnership principal brokerage account in New York between August, 1966 and April 11, 1967. He contends that he had only a 34.1733% interest in the shares sold, and asserts an exemption for such transactions under Reg. 154, 17 C.F.R. § 230.154.

Exhibit Z; LaMorte's Affidavit, p. 6). It is his position that a registration statement was not required since he did not engage in a distribution of his Shattuck stock.

█ We are therefore confronted with the SEC's allegation that its investigation has disclosed sales of 68,800 shares of Shattuck stock while LaMorte apparently contends that, with the exceptions previously noted, no sales did in fact occur. Whether a violation of the registration provision has occurred "turns on what happened and that is in sharp dispute; in such instances, the inappropriateness of proceeding on affidavits attains its maximum * * *." SEC v. Frank, 388 F.2d 486 (2d Cir. 1968). Resolution of the factual issues raised must await a trial. While defendant LaMorte has requested a hearing (Court Exhibit 2), the SEC and defendant Shattuck have taken the position that none is required (Court Exhibits 3 and 4).

Considering the papers before us, we find that the SEC fails to present a strong prima facie case justifying the issuance of a preliminary injunction. Accordingly, this phase of the motion is denied.

(b) *The Anti-Fraud Provisions*
*The press release of December 28, 1966*

On December 28, 1966, LaMorte, Shattuck's director-president,[4] issued [5] a press release confirming that Shattuck "is currently involved in negotiations looking toward the acquisition of a large, domestic, independent oil refining company" (SEC's Exhibit L). The news was carried on The Dow Jones Broad Tape and an article embracing the announcement appeared in the December 29th edition of The Wall Street Journal.

We are satisfied that on December 28th, Shattuck was involved in serious negotiations with B.A.C.K. Oil and Refining Company (hereinafter BACK) looking toward Shattuck's eventual acquisition of an oil refining company. While BACK itself was not the seller,[6] an agreement was worked out whereby Shattuck would exchange 1,800,000 shares of its unissued stock for all of BACK's outstanding shares if and when BACK acquired all of the outstanding and issued stock of the oil refining company [7] (SEC's Exhibit P; LaMorte's Exhibit 7). In a "Memo to Directors," dated December 9, 1966, LaMorte stated that "Shattuck Denn and/or BACK will arrange $35,000,000 of 6½% Debenture Bonds providing for an annual sinking fund over a 20 year period" (SEC's Exhibit Q; LaMorte's Exhibit 8(a)). The major portion of the net proceeds of this issue was to be used to pay Mr. Miller, principal owner of the properties involved.

We cannot find untruthful the December 28th release; we are not persuaded by the SEC's contention that it was rendered misleading by LaMorte's failure to disclose BACK's role in the acquisition.

---

4. LaMorte's term as President expired in June 1967. Mr. John A. Moss is presently Shattuck's president (Moss' Affidavit p. 1).

5. LaMorte alleges that the release was issued at the urging of Mr. Joseph O'Connor of the staff of the American Stock Exchange.

6. The controlling shareholders (C. Edward Miller being the principal one) of the companies involved agreed to sell their stock to BACK for $27,950,000 in cash provided certain conditions were met. The agreement was to remain in effect until February 1, 1967; it was not assignable, except to Shattuck, without the express consent of the sellers (LaMorte's Exhibit 9).

7. The agreement contemplated BACK's acquisition of U.S. Oil & Refining Company, Tacoma, Washington; Westoil Terminals Company, San Pedro, California; and Time Oil Company's San Pedro, California, Terminal.

These companies were to be consolidated into BACK which would simultaneously change its name to U.S. Oil and Refining Company. Upon the exchange of stock, U.S. Oil & Refining Company would operate as a wholly owned subsidiary of Shattuck (SEC's Exhibits P and Q; LaMorte's Exhibits 7 and 8(a)).

*The Journal article of January 17, 1967*

There are other aspects of LaMorte's deportment, however, which we do find reprehensible. Woodward B. Norton, a reporter for The Wall Street Journal, phoned LaMorte in mid-January and solicited information regarding negotiations for the proposed acquisition. During the conversation LaMorte is alleged to have revealed that $30,000,000 in financing had been arranged through the Bank of America for the Oil Company's acquisition (Norton's Affidavit, SEC's Exhibit N, p. 1). Using the information he acquired from LaMorte, Norton proceeded to prepare a draft of the article which appeared in the January 17, 1967 edition of the Journal.[8] LaMorte admits that he approved the substance of the draft, but contends that the story which appeared on January 17th "was cut down in various places" and therefore did not fully state all the facts as revealed by him, namely, that the $30,000,000 of financing which had been arranged was "subject to long-term financing" (LaMorte's Affidavit, pp. 15–16).

We are convinced that $30 million of financing for the oil company purchase, whether or not contingent upon long-term financing, had not been arranged by BACK or Shattuck in mid-January of 1967. LaMorte, in support of his contention that BACK had "proceeded to firm up" financing, annexes a Bank of America Memorandum, dated January 11, 1967, to his affidavit (LaMorte's Affidavit, p. 15). The last sentence of that memorandum indicates that LaMorte is clearly wrong: "Effective this morning, we have terminated our discussions with principals of the subject [BACK] as to providing any type of financing for the proposed transactions" (LaMorte's Exhibit 12).[9]

Accordingly, we find LaMorte's statement to Norton, regardless of whether or not he expressed the contingency of long-term financing, false when made. The materiality of this untruth will be observed when we consider the aftermath of the February 6th release.

*The press release of February 6, 1967*

On February 6, 1967, LaMorte, on behalf of Shattuck, issued a press release stating:

> Shattuck Denn Mining Corporation's recent negotiations to acquire a large, domestic, privately-owned oil refinery have been concluded on terms agreeable to both parties, it was announced today by Mr. Willard J. LaMorte, President of the Corporation.
>
> Since the acquisition is subject to approval by both the Board of Directors and by shareholders, Mr. LaMorte deemed it premature to discuss terms.
>
> Discussions have been initiated regarding the acquisition of a publicly held, integrated oil company encompassing production, refining and distribution, which would greatly expand contemplated operations. (LaMorte's Exhibit 17)

This announcement was carried on the Dow Jones Broad Tape on the 6th of February.

The SEC contends that the statement that "negotiations * * * have been concluded on terms agreeable to both parties" was false. The present record, however, seems to justify LaMorte's statement on February 6th that negotiations had been concluded on terms acceptable to the parties. Exhibits 14, 15, and 16 (annexed to LaMorte's Affidavit) sufficiently establish, for the purpose of this motion, that a tentative understanding was reached on February 4th

---

8. The portion of that article here in question reads as follows: "He [LaMorte] adds that about $30 million of financing to make the purchase has been arranged, principally through a California bank." (SEC's Exhibit M).
   Norton affirms that reference to Bank of America was omitted at LaMorte's request (Norton's Affidavit, SEC's Exhibit N, p. 2).

9. The SEC alleges that Asher, BACK's principal officer, testified that he notified LaMorte on January 13 or 14, 1967, that Bank of America had withdrawn from all negotiations (SEC's Affidavit, p. 27).

between Shattuck and BACK whereby Shattuck would acquire the oil refineries solely by placing 2 million of its shares in escrow and in trust for the current owners, Miller and others;[10] that Asher, BACK's principal officer, discussed these terms with Miller on February 6th and was assured by him that they were acceptable. We note that both Asher and Miller, in their testimony to the SEC (Exhibits R and S respectively), deny that Miller agreed to accept stock. However, Asher's signature appears on Exhibit 16 which states that Asher was assured by Miller that those terms were acceptable. The present record fails to convince us that the statement here in question was untrue when made.

While the press release may have been truthful on February 6th, it became false and misleading shortly thereafter. By mid-February, LaMorte definitely knew that Miller would not accept stock and was insisting on cash for a major portion of the purchase price.[11] The parties therefore were no longer in agreement on vital terms; negotiations would have to be resumed. Miller's insistence on cash posed an obstacle to consummation because, contra to what the January 17th article stated, no financing for the purchase had been arranged. Further, Miller's attorney, in his letter of February 21st, made it quite clear to both LaMorte and Shattuck that Miller no longer considered himself obligated since BACK had only been given until February 1st to negotiate a deal.[12] Miller did agree to continue "discussions," but "without any obligation whatsoever" on his part (LaMorte's Exhibit 20). It is evident that by late February the situation had changed drastically from that which prevailed on February 6th. The statement that "negotiations  *  *  * have been concluded on terms agreeable to both parties" was no longer true. Negotiations were to reopen, but the sellers were in no way obligated; terms of purchase which may have been mutually agreeable in the past were disregarded, and new terms would have to be negotiated. In essence, the acquisition which seemed so imminent on February 6th had become a mere possibility.

LaMorte made some attempts to arrange financing for the acquisition, but all to no avail. On May 12th, he received a letter from Miller's attorney stating that the "companies are not available for acquisition by Shattuck Denn Mining Corporation and/or B.A.C.K." (SEC's Exhibit X). That same day, LaMorte, acting on behalf of Shattuck, issued a press release stating that "previously announced arrangements for the acquisition of an oil refinery and terminal properties have been terminated" (SEC's Exhibit Y).

The January 17th article and the February 6th release undoubtedly led the investing public to believe that Shattuck's acquisition of an oil refining company was imminent. The public had been told that financing was arranged and terms of purchase were agreed upon;[13] yet the fact remains that financing was never arranged and terms formerly agreeable had become unacceptable. The February 6th release no longer reflected the true status of the acquisition. The public had the right to know that nego-

---

10. This agreement superseded the prior arrangement for the delivery to BACK of 1,800,000 shares of Shattuck stock and the payment to Miller of some $27 million. Under the new agreement, Shattuck would acquire the companies without incurring any debt (LaMorte's Exhibit 15).

11. John A. Moss, Shattuck's president, states that "between February 6 and 10  *  *  * Mr. Miller apparently changed his mind about accepting stock. On the latter date, the parties met in Los Angeles for further discussion, and Miller told LaMorte and Asher that, for tax reasons, he needed 17–20 million dollars in cash" (Moss' Affidavit, pp. 6–7).

12. See fn. 6, p. 473.

13. Under the terms of the February 4th agreement, no financing would be required. This fact, however, was not revealed in the February 6th release.

tiations were no longer concluded; that terms were no longer agreed upon; and that financing was now being "attempted." These facts, if known, would have put investors on notice that the February 6th release was no longer worthy of reliance.

■ LaMorte was an "insider," and as such he had the obligation to disclose material information [14] before using it to his own advantage by purchasing or selling Shattuck stock. During the period from February 7 to April 11, 1967, at least 6,328 shares of Shattuck stock in which LaMorte had a beneficial interest were sold (SEC's Exhibit B).

■ LaMorte had the duty to disclose that the statements contained in the February 6th release were no longer true. His failure to correct the "misleading impression left by statements already made" constituted a fraud. Cochran v. Channing Corp., 211 F.Supp. 239, 243 (S.D.N.Y.1962). Rather than remaining silent for three months, LaMorte had the clear obligation to inform the investing public that negotiations previously announced as having been agreeably concluded were now re-opened, and that terms formerly agreed upon were abandoned. Further, LaMorte made no attempt to correct the false statement attributed to him in the January 17th article. In effect, LaMorte allowed the public to continue believing that the acquisition was certain to occur when in fact, as he well knew, its consummation was anything but certain.

■ We are satisfied that LaMorte took advantage of his own nondisclosure by selling Shattuck stock at a time when its price was being influenced by the February 6th release. LaMorte's failure to disclose material information within his possession, which information would have corrected the false and misleading impression left by that February 6th release, constituted a violation of section 17(a) of the Securities Act, and section 10(b) of the Securities Exchange Act and rule 10b–5 promulgated thereunder.

We are satisfied that a reasonable likelihood of further violation exists. Accordingly, we grant that part of the motion which seeks to enjoin LaMorte from further violating the anti-fraud provisions.

Shattuck also remained silent despite its awareness that the February 6th release was no longer true. Shattuck knew that Miller had refused to accept stock and was requiring cash; that negotiations would have to be resumed; that financing had not been arranged; and that the sellers were no longer obligated. Its silence in the face of such knowledge is inexcusable; its assertion that it "believed the transaction would be consummated" (Moss' Affidavit, p. 8) is hollow.

■ There is, however, no showing that Shattuck derived any benefit from such nondisclosure, or that its purpose was to affect the market price of Shattuck stock to the advantage of Shattuck or any of its insiders.[15] Cf. SEC v. Texas Gulf Sulphur Co., 258 F.Supp. 262, 293–294 (S.D.N.Y.1966), appeal argued, 2d Cir. March 20, 1967. It there had been such a showing of corporate purpose, we would be inclined to enjoin Shattuck even though the SEC has not alleged that it engaged in any stock transactions.

---

14. Material information encompasses "those facts 'which in reasonable and objective contemplation might affect the value of the corporation's stock or securities * * *' Kohler v. Kohler Co., 319 F. 2d 634, 642, 7 A.L.R.3d 486 (7th Cir. 1963)." List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

15. The SEC has not met the assertions of Moss and other Shattuck directors that they did not know LaMorte was selling his own shares (Affidavits of Moss, Tozzi, Cameron and Davies).

This phase of the motion is denied as to Shattuck.

### (c) *The Reporting Requirement of Section 16(a)*

LaMorte filed Form 4 Statements of Changes in Beneficial Ownership for the months of February, March and April, 1966, as required by section 16(a) of the Securities Exchange Act and rule 16a–1 promulgated thereunder. On August 22, 1967, he filed a Form 4 statement for the month of July, 1967; annexed thereto were several schedules reflecting changes in LaMorte's direct and indirect ownership of Shattuck stock since April 30, 1964. These schedules indicate that numerous changes occurred in LaMorte's ownership of Shattuck stock during the years 1966 and 1967 for which no Form 4 statements were filed. The schedules also demonstrate that the statements previously filed in 1966 were without foundation in that they failed to disclose LaMorte's disposition of stock during those months. The failure to file proper Form 4 statements, and make complete disclosure in similar statements actually filed, constitutes a violation of section 16(a).

We are satisfied that a reasonable likelihood of further violation exists. This phase of the motion is granted to the extent that LaMorte is enjoined from further violating section 16(a).

The SEC also seeks an order compelling LaMorte to file revised Form 4 statements to reflect his sales of 68,800 shares of Shattuck stock through Forget and Forget Bahamas. As set forth in subdivision (a) of this opinion, whether or not the sales did in fact occur is a factual issue the determination of which must await trial. Request denied.

The foregoing shall constitute this Court's findings of fact and conclusions of law, pursuant to Rule 52(a), F.R.Civ. P.

Settle order on notice.