515 F.2d 801
 Fed. Sec. L. Rep. P 95,017
SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
MANAGEMENT DYNAMICS, INC., et al., Defendants, and William
N. Levy et al., Defendants-Appellants.
SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
MANAGEMENT DYNAMICS, INC., et al., Defendants, and Samuel D.
Hodge, Defendant-Appellant.
 Nos. 450, 773, 774, 807, Dockets 74-1680, 74-1686, 74-2148, 74-1842.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 29, 1975.
Decided March 18, 1975.
 
 Bert L. Gusrae, Lipkin, Gusrae & Held, New York City, for defendant-appellant William N. Levy.
 Richard M. Kraver, Feldshuh & Frank, New York City, for defendants-appellants A. J. Carno, Inc. and Anthony Nadino.
 Dan Brecher, New York City, for defendant-appellant Samuel D. Hodge.
 Richard E. Nathan, Securities and Exchange Commission (Lawrence E. Nerheim, David Ferber, and Frederick L. White, Washington, D. C., on the brief), for plaintiff-appellee.
 Before KAUFMAN, Chief Judge, and OAKES and GURFEIN, Circuit Judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 One indication of the scope of the securities law violations charged in this case is that eighteen defendants were made parties to this action by the Securities and Exchange Commission (SEC). Ten defendants consented to the issuance of permanent injunctions against them prior to the entry of judgment below, and another four determined not to appeal. Each appellant was enjoined from future violations of the registration and antifraud provisions of the securities laws, §§ 5(a), 5(c) and 17(a) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and rule 10b-5. Preliminary injunctions were issued against William N. Levy, A. J. Carno, Inc. (Carno), and Anthony Nadino after a two-day hearing before Judge Carter, and a permanent injunction was entered against Samuel D. Hodge after he failed to appear at the hearing pursuant to the district court's order. We affirm as to Levy, vacate in part as to Carno and Nadino, and vacate and remand as to Hodge.
 
 I.
 
 2
 The diffuse facts need only be limned with broad strokes to provide the necessary background for our decision. Management Dynamics (MD) was a company whose shares, issued in exchange for services or in private placements, were held by several hundred individuals and traded in over-the-counter market, though they were never registered with the Commission. In late 1971 or early 1972 a builder and developer named Edwin Barrett told Levy a director of MD of his desire to operate his business through a publicly-held company. In June 1972 Levy suggested MD as a suitable "shell"; it was publicly held and traded, had little debt, and was inactive. Barrett agreed to put approximately $100,000 into MD in exchange for 2.7 million shares of its common stock, subject to an increase in the number of authorized shares from 2 million to 8 million.
 
 
 3
 This agreement was made public in a letter to MD shareholders dated August 15, 1972 which was written and signed by Levy. A financial statement reviewed by Levy accompanied the letter. In addition to announcing a special shareholders' meeting to ratify the agreement with Barrett, the letter described the "Proposed Business" of the company as encompassing a broad range of real estate development activities. The notes to the financial statement listed two options to acquire land in Bass River Township, New Jersey, and in Harleysville, Pennsylvania, as some of the assets contributed by Barrett. Judge Carter found this communication misleading because it failed to disclose Barrett's indispensability to the company's operations and the various contingencies hedging successful development of the land subject to the options. The MD shareholders ratified the agreement with Barrett and the increase in authorized shares on September 6, 1972.
 
 
 4
 Judge Carter also found misleading a letter dated October 25, 1972 and a press release dated October 13, 1972, sent to shareholders and other requesting information about MD. Levy had reviewed each of these communications before they were mailed. The letter stated that financing was expected by February 15, 1973 for a project to construct garden apartments in Red Hill, Pennsylvania, although at the time there was little certainty that this prophecy would be fulfilled. The letter went on to mention the option for land in Bass River Township, without noting that successful completion of the project would require approval by local, state, and federal government units on a variety of matters, including zoning and the environmental aspects of the construction of a sewage facility. The letter also discussed a planned residential development near Landsdale, Pennsylvania which apparently was identical with the Harleysville option listed in the August 15 letter. Although the October letter noted that the project was "contingent upon the successful achievement of zoning changes," the district court found failure to disclose the "indeterminate nature of the option" misleading, perhaps because the letter did not describe the massive nature of the zoning change required to permit high density residential construction on land then classified as agricultural.
 
 
 5
 The press release described an MD plan to build a retirement community on 700 acres of land in Burlington County, N.J., on which the company had secured an option. The release noted that the option was subject to passage of a local ordinance to permit such construction, to which there appeared to be "no obstacle," and the obtaining of state permission to erect a sewage recovery plant. The district court found the release misleading for its failure to indicate that the required approval might not be given, and that the necessary financing over $1,000,000 of purchase price and more than $25,000,000 in mortgage financing might not be obtained.
 
 
 6
 Judge Carter found these misstatements and omissions sufficient to establish a violation by Levy of the antifraud provisions. He was of the view that the totality of Levy's conduct warranted the issuance of a preliminary injunction against him since Levy's responsibility for the communications was clearly established. He had written the August letter and reviewed the October mailings. He was also familiar with the securities field which had been a major part of his legal practice since 1969. In sum, his violations could not be described as inadvertent.
 
 
 7
 The judge also found that Levy had violated the registration provisions in connection with a series of events which may best be labelled the "Watson transaction." In October 1972, Levy suggested to the MD board of directors that they issue unregistered shares at $1.10 a share through one Peter R. Watson, who claimed to be the agent for certain individuals who sought to invest in the restricted shares of small companies. A condition of the sale was that the certificates bear no legend identifying them as unregistered securities, since Watson's purported principal desired to avoid any obstacles which might prevent transfer of restricted stock even after the requisite holding period. In addition, Levy testified, Watson's principal insisted on being shown the stock certificates for 560,000 shares issued in Watson's name, which would be exact facsimiles of the shares he would receive.
 
 
 8
 Levy advised the board that an arrangement of this sort would be proper if Watson signed an investment letter indicating knowledge that the stock was restricted. No such letter was ever signed. The board authorized the issuance of the 560,000 shares in 5000 share lots, which Levy advised were sufficiently large to lead any reasonable purchaser to ask the transfer agent or company whether the shares were restricted. Although the board directed Levy to retain the certificates until Watson identified the purchaser and placed the purchase price in escrow, Levy turned the certificates over to Watson in Florida in mid-October. Approximately one week later Levy suggested to the board, at Watson's request, that 400,000 additional shares be issued under similar conditions. These certificates were forwarded to Watson in Dallas, Texas.
 
 
 9
 The saga of MD stock now shifts scenes. In November or December, Anthony Nadino, vice-president of A. J. Carno, Inc., received a telephone call from an unknown individual who stated that he was from California, and who identified himself as "Buzz." The caller inquired about the market price in MD stock and size of that market, and stated that he had 100,000 shares for sale. At Nadino's request, "Buzz" furnished the specific numbers of the certificates. Nadino communicated with the transfer agent, who informed him that these shares had been issued in Watson's name. Another 200,000 of Watson's shares had been delivered to the Central Cleveland International Bank in New York City as potential collateral for a loan.
 
 
 10
 As might be imagined, Watson never succeeded in selling MD stock to his European principal, and in December Levy requested the return of the 960,000 shares. MD received shipment of 710,000 shares and the receipt for the 200,000 shares at the Central Cleveland Bank soon thereafter, but the remaining 50,000 shares were not received until January 28, 1973. The district court found that Levy's action in authorizing and delivering the MD shares without restrictive legend enabled Watson to offer them for sale, and constituted a violation of the registration provisions which justified issuance of a preliminary injunction.
 
 
 11
 The remainder of the case presented for our consideration relates to trading in MD stock by certain broker-dealers. The SEC's theory of the events, as recounted in its brief, provides a useful backdrop for evaluating the actual findings of the district court. According to the Commission, Global Securities, Inc. decided in the fall of 1972 to tout MD stock using the two shareholder letters and the press release prepared by MD and to distribute it to its customers. MD had theretofore been traded only infrequently, and the only quotations appearing in the "pink sheets" in June and July 1972 were bids of $0.375 per share. Global was aided in this endeavor by Samuel D. Hodge, who in October 1972 purchased a one-third interest in Global and became its vice president, loaned the company $25,000, and sold it (and other firms) some of his own MD shares.
 
 
 12
 Global enlisted three over-the-counter firms Mayflower Securities, Fairfield Securities, and appellant Carno to place quotations for MD stock in the pink sheets, and to resell to Global, at a profit, the MD shares which they purchased. This arrangement, naturally enough, created the appearance of a far greater interest in the stock than if Global alone had entered quotations. Although they had little or no information about the company or its financial prospects, the broker-dealers engaged in active and continuous trading in MD until December 8, 1972, when the SEC suspended trading. The vast bulk of their sales were to Global, who in turn resold MD to its customers at prices as high as $6 per share reflecting a rise in the price of the stock from about 38 cents in a six-month period. At that price, the company's market value would be estimated to be some $24,000,000, which, of course, was far in excess of any realistic assessment of its worth.
 
 
 13
 Judge Carter's findings of fact as they relate to Carno and its vice-president Nadino are far more limited than the elaborate theory sketched by the SEC. Nadino was found to have begun trading in MD stock in June 1971, although at the time he knew nothing about the company. The material about MD which Carno possessed, including the August and October communications, did not provide meaningful information about the nature of MD's business, property, or past earnings, and the quotations submitted were based solely on the market for MD shares. Of the 11,226 MD shares purchased by Carno between September 28, 1972 and November 15 of the same year, 9825 were sold to Global.
 
 
 14
 The district judge found that the quotation of MD at prices which bore no relation to the activities of the company violated the antifraud provisions of the 1934 Act and rule 10b-5. Judge Carter concluded that the record established the maintenance of "artificially high prices" and "fictitious quotation and manipulation of MD shares," and preliminarily enjoined Carno and Nadino from further violations. In addition, the court held that this activity by the brokers who were maintaining a market in MD stock "aided" the Watson transaction by providing a purchase price on which sales of unregistered stock could be based. The judge granted a preliminary injunction restraining Carno and Nadino from violating the registration provisions as well.
 
 II.
 
 15
 Initially, we direct our attention to appellants' claim that the district court applied the incorrect legal standard in granting preliminary injunctions against them. The thrust of their contention is that SEC injunction actions, like those in suits between private parties, are governed by the criteria which we articulated in Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973):
 
 
 16
 The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. (emphasis in original)
 
 
 17
 Focusing alternatively on each branch of this test, appellants argue that the district court's failure to find either a threat of irreparable injury if the preliminary injunction were not granted, or a balance of hardships favoring the S.E.C., requires reversal of its decision.
 
 
 18
 Appellants' effort on this point is valiant, through it must fail. We believe it appropriate to review briefly the principles applicable to these cases, and begin by noting the areas in which the district court cannot be faulted. Mindful of our admonition that the Commission's determination that a violation occurred does not obviate the need for an independent judicial determination, SEC v. Frank, 388 F.2d 486 (2d Cir. 1968), the judge held a two-day hearing at which twelve witnesses testified. Judge Carter found not only the requisite "strong prima facie case to justify the discretionary issuance of the interlocutory restraint," SEC v. Boren, 283 F.2d 312, 313 (2d Cir. 1960), but also concluded that the particular violations alleged "Have Been Established." Although one may contest the correctness of this finding, a matter to which we shall soon turn, the opinion makes it clear that the district judge believed that the violations were conclusively demonstrated.[1]
 
 
 19
 But such illegal activity, without more, does not automatically justify the issuance of an injunction. Section 20(b) of the Securities Act of 1933 and § 21(e) of the Securities Exchange Act of 1934, pursuant to which this SEC enforcement action has been instituted, provide for injunctive relief only when a person "is engaged or about to engage" in illegal acts. We have, accordingly, held that the "critical question" in issuing an injunction is whether "there is a reasonable likelihood that the wrong will be repeated." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972).[2]
 
 
 20
 Certainly, the commission of past illegal conduct is highly suggestive of the likelihood of future violations. See, e. g., SEC v. Manor Nursing Centers, Inc., supra ; SEC v. Culpepper, 270 F.2d 241 (2d Cir. 1959); SEC v. Keller Corp., 323 F.2d 397, 402 (7th Cir. 1963). Whether the inference that the defendant is likely to repeat the wrong is properly drawn, however, depends on the totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant. See, e. g., SEC v. Harwyn Industries Corp., 326 F.Supp. 943, 957-58 (S.D.N.Y.1971). (Mansfield, J.) Moreover, appellate courts have repeatedly cautioned that cessation of illegal activity does not ipso facto justify the denial of an injunction. United States v. Parke, Davis & Co., 362 U.S. 29, 47-48, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) (vertical price-fixing); SEC v. Manor Nursing Centers, Inc., supra, at 1101; SEC v. Boren, supra, 283 F.2d at 313-14; SEC v. Culpepper, supra ; SEC v. Torr, 87 F.2d 446, 449 (2d Cir. 1937).
 
 
 21
 We find it clear beyond cavil that the district court was aware of, and based its decision on, these pertinent legal principles. For implicit in the court's observation that injunctive relief is not barred by a defendant's disclaimer of an intent to violate the law in the future, or even by cessation of the illegal acts, is the principle that past violations may in certain circumstances justify an inference that a defendant is likely to violate the law in the future if not enjoined. Thus, appellants' claim that the district court failed to make a specific finding that they were likely to engage in future illegal activity is without merit. Compare SEC v. Culpepper, supra, at 250 (finding of likelihood of further violations is implicit in district court's conclusion that an injunction is necessary for the protection of the public interest). Nor is appellants' argument that further violations are impossible since MD is no longer being traded more telling. Since the SEC suspension of MD stock was lifted some three months before suit, see Securities Exchange Act Release No. 10,047 (Mar. 19, 1972), continued trading in MD could be anticipated, and the district court's conclusion that further violations were likely cannot be labelled as erroneous.
 
 
 22
 Accordingly, appellants' contention on this point stands or falls with its claim that preliminary injunctions cannot be granted at the SEC's behest unless a district court finds irreparable injury or a balance of equities which favors the Commission. The appellants' crucial error on this score is their assumption that SEC enforcement actions seeking injunctions are governed by criteria identical to those which apply in private injunction suits. Unlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are "creatures of statute." "(P) roof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction" is not required. III L. Loss, Securities Regulation 1979 (1961, Supp.1969). See 7 Moore's Federal Practice P 64.04(1), at 65-40 to -41 (2d ed. 1974). We noted in SEC v. Torr, 87 F.2d 449, 450 (2d Cir. 1937);
 
 
 23
 As the issuance of an injunction in cases of this nature has statutory sanction, it is of no moment that the plaintiff has failed to show threatened irreparable injury or the like, for it would be enough if the statutory conditions for injunctive relief were made to appear.
 
 
 24
 This principle has been applied in granting both permanent injunctions[3] and preliminary injunctions,[4] and we perceive no reason why it should not be applicable here.
 
 
 25
 We scarcely mean to imply that judges are free to set to one side all notions of fairness because it is the SEC, rather than a private litigant, which has stepped into court. The securities laws, like the price control legislation in Hecht Co. v. Bowles, 321 U.S. 321, 328-31, 64 S.Ct. 587, 88 L.Ed. 754 (1944), hardly evidence a Congressional intent to foreclose equitable considerations by the district court. Indeed, appellate courts regularly direct district courts which have erroneously denied injunctions requested by the SEC to exercise an "equitable discretion" on remand. See, e. g., SEC v. North American Research & Development Corp., 424 F.2d 63, 81, 83, 85-86 (2d Cir. 1970). And, as we said in SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1102 (2d Cir. 1972), "in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts." But the statutory imprimatur given SEC enforcement proceedings is sufficient to obviate the need for a finding of irreparable injury at least where the statutory prerequisite the likelihood of future violation of the securities laws has been clearly demonstrated.
 
 
 26
 The rationale for this rule is readily apparent. It requires little elaboration to make the point that the SEC appears in these proceedings not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws. Hence, by making the showing required by statute that the defendant "is engaged or about to engage" in illegal acts, the Commission is seeking to protect the public interest, and "the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief." Hecht Co. v. Bowles, supra, 321 U.S. at 331, 64 S.Ct. at 592. To a large extent, then, a finding that future violations are likely to occur implies that a significant injury to the public has been shown to the judge's satisfaction. Compare United States v. Diapulse Corp. of America, 457 F.2d 25, 28 (2d Cir. 1972) (Food and Drug Act). But insofar as it is urged that a greater showing of irreparable injury is required if the defendant's actions are to be enjoined, we believe the effective enforcement of the securities laws would be jeopardized if that principle were adopted.[5]
 
 III.
 LEVY
 
 27
 The numerous other contentions which Levy raises are so palpably without merit that they require little extended discussion.
 
 
 28
 The dominant theme of Levy's argument in connection with the antifraud violations is that the various omissions or misstatements identified by the district court are either nonexistent, because adequate disclosure was made, or not material, because the hypothetical reasonable investor, see SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), would not attach importance to them. To be sure, several of the points raised by Levy involve subtle issues concerning the degree and nature of disclosure demanded by the antifraud provisions in particular contexts.
 
 
 29
 But we need not tarry over these matters, for the record clearly discloses the existence of misleading statements of material matters. The many obstacles to successful development of the Bass River Township project were not mentioned in the October letter, and the press release describing the Burlington County retirement community omitted reference to the massive financing required. Indeed, the release gave the impression that the project was virtually certain to be completed, when the hurdles to development were so formidable that it was in fact little more than an idea in which the developers had faith. Levy's responsibility for these statements is clear, for he reviewed them and even suggested changes in language which Barrett adopted. Nor can he cloak himself in a professed ignorance regarding the real estate ventures, which he maintains led him to rely on the information supplied by Barrett. As an experienced securities lawyer, Levy surely should have known that contingencies cloud the horizon of almost every business venture, and he should have asked Barrett to tell him about potential obstacles to the planned developments. Moreover, and particularly because of his expertise, he should have insisted that these possible impediments be identified in any communication which described the projects. Thus, the district court's conclusion that Levy's action was not "inadvertent" is not erroneous, and the record demonstrates at least that degree of negligence which suffices for the grant of injunctive relief in SEC enforcement actions. See, e. g., SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 863.
 
 
 30
 Levy's arguments concerning the violations of the registration provisions are no more compelling. Several of his actions, documented by the record, preclude him from successfully sustaining his claim that the Watson transaction is exempt from the registration provisions under § 4(2) of the Securities Act as a legitimate private placement. See SEC v. Ralston-Purina Co., 346 U.S. 119, 126-27, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). As we have noted, Levy brought Watson's proposal to the board's attention, and advised the directors that the shares could not be issued without restrictive legend. Granting that it was not an unconditional requirement of a valid private placement at that time, it is clear, and an expert such as Levy must have known, that such a legend is the single most effective device for preventing the resale of restricted shares. Accordingly, Levy's advice that 5000 share units could be issued without legend is probative of his high degree of carelessness in failing to comply with registration provisions. Moreover, the inherent implausibility of Watson's justification for requiring non-legend certificates in relatively small units would have put even a much less experienced lawyer on guard that something might be amiss.
 
 
 31
 Levy also disobeyed the board's explicit instructions in delivering the certificates to Watson. And despite his representation to the board that Watson would sign a document testifying to his intention not to resell the shares in public sale, such a writing was never executed. Levy's action thus enabled Watson to offer the MD shares for sale to anyone, despite the fact that they had never been registered. His conduct was sufficient to justify issuance of the injunction against him. SEC v. Spectrum, Ltd., 489 F.2d 535, 541-42 & n. 12 (2d Cir. 1973).
 
 
 32
 Levy maintains, however, that the Securities Act was not violated because there was no competent evidence at trial that a sale of unregistered securities ever occurred. The key elements of his contention, as we understand them, are that all the evidence on this charge was inadmissible hearsay, and that in any event, no completed sale or firm offer to sell was ever shown.
 
 
 33
 This contention fares no better than Levy's other claims. Though the hearsay rule precludes any dependence on the credibility of the mysterious "Buzz" who called Nadino, the fact that a request was made for a quotation on MD stock and for information concerning the breadth of the market, see C. McCormick, Evidence § 228, at 463-64 (1954), by someone who knew and could reveal the certificate numbers for 100,000 shares issued to Watson, see id. at 466-67, is certainly probative evidence that at least "(a) solicitation of an offer to buy" occurred. See § 2(3) (offer to sell unregistered stock, which is illegal under § 5(c), includes solicitation of offer to buy).
 
 IV.
 Nadino
 
 34
 Nadino's brief forcefully argues that he had no connection with the misleading letters and press release for which Levy was enjoined. Although this may well be true, it is apparent that the preliminary injunction to restrain Nadino from violating the antifraud provisions did not issue on this ground. Rather, the district court found that the "fictitious quotation and manipulation of MD shares," traded at "artificially high prices" "not related to the activities of the company," established the violation.
 
 
 35
 The promulgation of false and misleading quotations or manipulations of the market violate the antifraud provisions. See generally A. Bromberg, Securities Law, Fraud SEC Rule 10b-5, § 5.2 (1967); Dlugash v. SEC,373 F.2d 107 (2d Cir. 1967); Tager v. SEC, 344 F.2d 5 (2d Cir. 1965); SEC v. Resch-Cassin & Co., 362 F.Supp. 964, 975 (S.D.N.Y.1973). Cf. Franklin National Bank v. L. B. Meadows & Co., 318 F.Supp. 1339 (E.D.N.Y.1970). And the record discloses that the district court's finding and conclusion that such activity occurred is not erroneous. The trading in MD stock, and the $6 price to which it rose from 38 cents in a period of about six months, bore no logical relationship to the company's business. Nadino continued trading, at continuously rising prices, although he knew little if anything about the company,[6] and notwithstanding an unanswered inquiry which he had sent to MD requesting additional information. Moreover, Nadino knew well that Global was purchasing the vast majority of the MD shares, but never saw fit to seek an explanation for this buying activity.
 
 
 36
 We believe, however, that so much of the preliminary injunction which restrained Nadino from violating the registration provisions must be vacated. We set to one side the question whether Nadino violated § 5 by trading in the unregistered MD stock, or whether such trading was subject to the dealer or broker exemptions of § 4(3) and § 4(4). For it is apparent that the injunction was not issued for this reason, but because the maintenance of a market in MD shares by Nadino and the other broker-dealer defendants "aided" the "Watson maneuvering" by providing him with a price which he could fix for the sale of his unregistered shares.
 
 
 37
 The defect in the district court's conclusion is that the opinion is bare of any finding that Nadino knew or should have known that his trading activity would assist MD in disposing of additional unregistered shares. It is true, of course, that unregistered shares can more easily be sold when a company's shares are publicly traded. But we perceive no reason why Nadino should have assumed that an attempt to violate the registration provisions would occur, and that his activity would aid such a violation.
 
 
 38
 To be sure, the standards of criminal liability for aiding and abetting are not applicable to SEC enforcement proceedings, SEC v. Spectrum, Ltd., 489 F.2d 535, 542 (2d Cir. 1973), but to apply Spectrum as sanctioning the district court's conclusion here, as the SEC urges, is to distort that holding. In Spectrum we ruled that the liability of a lawyer as an aider and abettor was to be measured by the negligence standard generally applicable to SEC injunction actions and the high degree of carelessness present there.
 
 
 39
 Nadino's position, however, is hardly comparable to that of the lawyer in Spectrum. Schiffman the attorney in Spectrum could easily have concluded that the opinion letter which he issued was likely to be used to sell unregistered securities; but we cannot imagine how Nadino could be expected to surmise that his trading activity would aid Watson's unrelated and independent scheme to sell 960,000 unregistered shares. The crucial element of our ruling in Spectrum was that the abettor's responsibility for the alleged violation must be measured by the appropriate standard of negligence, that is, the defendant should have been able to conclude that his act was likely to be used in furtherance of illegal activity. Since even this has not been demonstrated as to Nadino, we find that so much of the preliminary injunction which restrains him from violation of the registration provisions must be vacated.
 
 V.
 
 40
 A. J. CARNO, INC.
 
 
 41
 The injunction for violation of § 5 must be vacated against broker-dealer A. J. Carno, Inc. as well, since its acts have no greater nexus to the Watson transaction than did those of its employee, Nadino. Carno also maintains that the record indicates no violation of the antifraud provisions other than the trading activity by Nadino, and that its liability should consequently be measured by the "controlling person" standard of § 20(a). That section provides that a controlling person (Carno) is liable for the acts of a controlled person (Nadino), "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Carno contends that it did not induce Nadino to engage in the illegal acts, and that its good faith is demonstrated by the system of checks and balances which it instituted for overseeing the activity of its traders. The SEC has argued, on the contrary, that § 20(a) was not intended to measure the liability of employers for the acts of their employees. Rather, it suggests the ordinary principles of agency should apply, and an employer should be liable for the acts of an employee acting within the scope of his authority. We agree with the Commission that with respect to SEC enforcement actions, § 20(a) was not intended as the sole measure of employer liability. Accordingly, we affirm the entry of the injunction against Carno for violation of the anti-fraud provisions.
 
 
 42
 The legislative history of § 20(a), and of its analogue in the Securities Act of 1933, § 15, gives no indication that Congress intended them to govern employer liability. Section 15 had its genesis in the concern that directors would attempt to evade liability under the registration provisions by utilizing "dummy" directors to act in their stead. S.Rep.No.47, 73d Cong., 1st Sess. 5 (1933); H.R.Conf.Rep.No.152, 73d Cong., 1st Sess. 27 (1933). And § 20(a) was consciously modelled after § 15 of the 1933 Act. As Thomas C. Corcoran, one of the authors of the 1934 Act, testified before the Senate Committee:
 
 
 43
 Without reading those paragraphs (of what is now § 20), the first is taken verbatim from the Securities Act. The purpose is to prevent evasion of the provisions of the section by organizing dummies who will undertake the actual things forbidden by the section.
 
 
 44
 Hearings before the Senate Comm. on Banking and Currency on S.Res. 84 (72d Cong.) and S.Res. 56 and 97 (73d Cong.), 73d Cong., 1st Sess., pt. 15, at 6571 (1934).[7]
 
 
 45
 Moreover, given the pervasive applicability of agency principles elsewhere in the law, it would take clear evidence to persuade us that Congress intended to supplant such principles by enacting the "controlling person" provisions. Not only is such evidence lacking, but the statute itself suggests otherwise. "Person," a key term in each act, is defined to include not only an individual or partnership, but also a corporation. Section 2 of the Securities Act of 1933; § 3(a)(9) of the Securities Exchange Act of 1934. Thus, Congress evidently intended that a corporation might be liable in some instances as a "person"; and this can only be by virtue of agency principles, since a corporation can act only through its agents. Were §§ 15 and 20(a) the sole measures of corporate liability, as Carno's argument implies, the inclusion of corporations under the definitions of "person" would be not only unnecessary but also misleading.
 
 
 46
 We find it plain, therefore, that the "controlling person" provisions were enacted to expand, rather than restrict, the scope of liability under the securities laws. See Myzel v. Fields, 386 F.2d 718, 737-39 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); Richardson v. MacArthur, 451 F.2d 35, 41-42 (10th Cir. 1971). Control was defined in a broad fashion, see H.R.Rep.No.1383, 73d Cong., 2d Sess. 26 (1934), to reach prospective wrongdoers, rather than to permit the escape of those who would otherwise be responsible for the acts of their employees.[8]
 
 
 47
 Our conclusion is buttressed by the clear holdings of the four circuits which have applied agency principles to hold brokerage firms liable for the acts of their employees. Johns Hopkins University v. Hutton, 422 F.2d 1124, 1130 (4th Cir. 1970); Lewis v. Walston & Co., 487 F.2d 617, 623-24 (5th Cir. 1973); Armstrong, Jones & Co. v. SEC, 421 F.2d 359, 361-62 (6th Cir.), cert. denied, 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970); Fey v. Walston & Co., 493 F.2d 1036, 1051-53 (7th Cir. 1974).[9]
 
 
 48
 Nor does our recent decision in Gordon v. Burr, 506 F.2d 1080, 1085-86 (2d Cir. 1974), dictate a contrary result. In that case, liability could not have been imputed under agency principles, since no one connected with the transaction was acting on behalf of the brokerage firm, id. at 1085, see ALI, Restatement (Second) of Agency § 235 (1958). Nor could the plaintiff Gordon have reasonably concluded that Lord was acting on behalf of the firm. See Brief of Philips, Appel & Walden at 29-32; 506 F.2d at 1085; ALI, Restatement (Second) of Agency § 265.
 
 
 49
 We need not decide today whether the entire corpus of agency law is to be imported into the securities acts for all purposes. We hold only that, in the circumstances of this case, the SEC in this enforcement action was entitled to an injunction against Carno because of Nadino's trading activity. As vice-president in charge of trading, Nadino occupied a prominent position within the company. By virtue of his position he was able for months to submit fictitious quotations on MD stock in the firm's name in the pink sheets. The misleading appearance of activity in MD stock thereby created was in significant measure a consequence of the employment relationship, which not only afforded Nadino the opportunity to submit the misleading quotations, but identified the firm as their source. The apparent authority exercised by Nadino makes it appropriate to enjoin Carno from violation of the antifraud provisions. We stress again, however, that we intimate no view as to other cases which may involve lesser employees, actions for damages, other agency principles, or respondeat superior, which may be broader than the apparent authority involved here.[10] Such cases may involve entirely different policy considerations that are best consigned to future resolution.
 
 HODGE
 
 50
 Our disposition of Hodge's claim may best be understood after a brief recitation of the circumstances which led to the entry of a permanent injunction against him. On October 19, 1973, the first day of the hearing on the preliminary injunction, the Commission informed the district court that it had been unable to take Hodge's deposition because he had objected to the notice of deposition. Noting that it desired Hodge to appear as a witness on October 23, the Commission requested an order to that effect.
 
 
 51
 Hodge's counsel informed the court that his client was required to care for his crippled and blind wife, and that such short notice might not enable Hodge to find an aide to take his place. On October 23, when Hodge did not appear, the court declared him in default, and after submission of a proposed default judgment by the Commission on April 5, 1974, the judge entered a permanent injunction against him on April 18. No findings as to illegal acts engaged in by Hodge or the need for injunctive relief were ever made.
 
 
 52
 We find it plain that the entry of a permanent injunction without appropriate findings violates the command of Fed.R.Civ.P. 52(a), that
 
 
 53
 the court shall find the facts specially and state separately its conclusions of law thereon.
 
 
 54
 And, indeed, the Rule provides further that even in the case of an interlocutory injunction "the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action." To be sure, "a default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability." Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 69 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). But it is clear that the fact of liability alone does not establish a right to a specific form of relief. Accordingly, unless the amount of damages are absolutely certain, the court is required to make an independent determination of the sum to be awarded. Fed.R.Civ.P. 55(b); Hughes, supra, at 69-71. We perceive no reason why a similar requirement should not be applicable to the granting of an injunction, which is appropriately entered only after the exercise of a court's discretion, and upon a finding of the likelihood that the defendant would commit future violations if not enjoined. Since the district court made no such findings as to Hodge, the permanent injunction against him must be vacated and the case remanded for appropriate findings.
 
 
 55
 We express no opinion at this time as to the propriety of the entry of default itself. Although we have upheld default judgments issued for "willful and deliberate disregard of reasonable and necessary court orders," Trans World Airlines, Inc. v. Hughes, 332 F.2d 602, 614 (2d Cir. 1964), we have stressed that "(t)he sanction of judgment by default . . . is the most severe sanction which the court may apply, and its use must be tempered by the careful exercise of judicial discretion to assure that its imposition is merited." Id. On the record before us, we are unable to determine whether the proffered excuse for Hodge's failure to appear, though it strikes a sympathetic chord, was sufficiently credible to have excused his disobedience of the district court's order. That determination is better made by the court below on a motion under Fed.R.Civ.P. 55(c) to set aside the entry of default, after consideration of the medical evidence relating to Mrs. Hodge's serious disability and the proof that no one could be found to care for her during Hodge's absence on October 23.
 
 
 56
 To recapitulate our holding briefly, we affirm the entry of the preliminary injunction against Levy in all respects. The preliminary injunction against Carno and Nadino insofar as it restrains the violation of the antifraud provisions is affirmed, but is vacated with respect to restraining violation of the registration provisions. The injunction entered against Hodge is vacated and his case remanded to the district court for proceedings in accordance with this opinion.
 
 
 
 [1]
 See S. E. C. v. Capital Gains Research Bureau, Inc., 306 F.2d 606, 608 (2d Cir. 1962) (en banc), rev'd on other grounds, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963):
 The only question presented at this stage of the proceedings, namely an application for a preliminary injunction in advance of a trial upon the merits, is whether a violation . . . has been so clearly established that defendants are, in effect, to be found at fault without awaiting the development of all the facts upon a trial.
 
 
 [2]
 Accord, Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 394, 405-06 (2d Cir.), cert. denied, 414 U.S. 910, 924, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); SEC v. Culpepper, 270 F.2d 241, 249-50 (2d Cir. 1959). See United States v. W. T. Grant Co., 345 U.S. 629, 632-33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (Clayton Act). See generally III L. Loss, Securities Regulation 1975-76 (1961, Supp.1969)
 
 
 [3]
 See, e. g., SEC v. Tax Service, Inc., 357 F.2d 143, 145 (4th Cir. 1966); III L. Loss, Securities Regulation 1979 (1961, Supp.1969)
 
 
 [4]
 See, e. g., SEC v. Torr, 87 F.2d 446, 450 (2d Cir. 1937); SEC v. Globus Int'l, Ltd., 320 F.Supp. 158, 160 (S.D.N.Y.1970); SEC v. Shattuck Denn Mining Corp., 297 F.Supp. 470, 472 (S.D.N.Y.1968); SEC v. Broadwall Securities, Inc., 240 F.Supp. 962, 967 (S.D.N.Y.1965); SEC v. General Securities Co., 216 F.Supp. 350, 352 (S.D.N.Y.1963); SEC v. Mono-Kearsarge Consol. Mining Co., 167 F.Supp. 248, 261 (D.Utah 1958)
 
 
 [5]
 We need not delineate the precise standards for those cases in which the fact of violation and the likelihood of future infractions are not as clear as in the case at bar. Suffice to say that in such cases the district court will attach greater weight to traditional equitable principles in arriving at its conclusion. SEC v. Manor Nursing Centers, Inc., supra, at 1102. In any event, as we have stated, since the SEC seeks to vindicate the public interest, the need to enforce the securities laws must be given special emphasis in the district court's calculus. "In the formulation of its discretion it should recognize that the public interest, when in conflict with private interest, is paramount." SEC v. Culpepper, supra, 270 F.2d at 250
 
 
 [6]
 The district court noted that the lack of adequate knowledge about MD was "fraudulent" under rule 15c2-11. Nadino maintains that this was an impermissible finding, since that rule was not cited in the complaint or in any of the papers before the court, and that in any event, his conduct was exempt from that provision by 15c2-11(f)(3). We reject each of these contentions. Nadino has not succeeded in demonstrating a pattern of trading in MD prior to his entry of his first quotation that would satisfy the detailed requirements of the (f)(3) exemption. Nor does a fair reading of the opinion indicate that the district court based its decision on the rule. Indeed, the text of the injunction issued against Nadino tracks the language of rule 10b-5 rather than rule 15c2-11. Thus, we are satisfied that the district court relied on rule 15c2-11 only insofar as it indicated that the trading in MD was fictitious and manipulative
 
 
 [7]
 See also the testimony of Richard Whitney, then President of the New York Stock Exchange:
 These provisions seem to apply more particularly to corporations and officers, directors, and shareholders of corporations, than to exchanges or brokers.
 Id. at 6639.
 
 
 [8]
 Needless to say, liability in the employment context is a vastly different situation from the liability of individual outside directors, which is properly measured only under the "controlling person" provisions. See Lanza v. Drexel & Co., 479 F.2d 1277, 1299 (2d Cir. 1973) (en banc)
 
 
 [9]
 Several courts have found employers liable for the acts of their employees under the "controlling person" provision without finding it necessary to consider agency principles. See, e. g., Richardson v. MacArthur, 451 F.2d 35, 41-42 (10th Cir. 1971); Hecht v. Harris, Upham & Co., 430 F.2d 1202, 1210 (9th Cir. 1970). Cf. Kamen & Co. v. Paul H. Aschkar & Co., 382 F.2d 689, 696-97 (9th Cir. 1967), cert. dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 45 (1968) (discussion of securities violations solely under § 20(a) after conclusion that liability under agency principles did not exist with respect to common law courts)
 
 
 [10]
 See Note, The Burden of Control: Derivative Liability Under Section 20(a) of the Securities Exchange Act of 1938, 48 N.Y.U.L.Rev. 1019, 1029-31 (1973)